# ORIGINAL

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

LUAN Q. TRINH and CHI LUONG, ) CIVIL NO. 03-00017
h/w )
)
        Plaintiffs, )
)
   vs. )
)
MARYFE A. CULIAT and FELY A. )
CULIAT, )
)
        Defendants. )
)
_____)

**FILED**
DISTRICT COURT OF GUAM
JUL - 1 2005
MARY L.M. MORAN
CLERK OF COURT

(57)

### DEPOSITION OF MARYFE A. CULIAT

Taken on behalf of Plaintiffs at the law offices of Case

Bigelow Lombardi, 2600 Mauka Tower, 737 Bishop Street,

Honolulu, Hawaii 96813, commencing at 10:05 a.m., on

Tuesday, March 22, 2005, pursuant to Notice.

BEFORE:

    Donna Kohls, CSR 146
    Notary Public, State of Hawaii

1    APPEARANCES:

2    For Plaintiffs:          WAYSON W. S. WONG, ESQ.
                              Law offices of Wayson Wong
3                             142 Seaton Blvd., Suite 203
                              Hagatna, Guam 96910
4
     For Defendants:          MICHAEL L. LAM, ESQ.
5                             Case Bigelow Lombardi
                              2600 Mauka Tower
6                             737 Bishop Street
                              Honolulu, Hawaii 96813
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

EXAMINATION BY:                                          PAGE

Mr. Wong                                                 4
Mr. Lam                                                  79

FURTHER EXAMINATION BY:

Mr. Wong                                                 80

EXHIBITS MARKED FOR IDENTIFICATION:

1    Diagram depicting four lanes                        18

2    Guam Police Department Traffic                      23
     Accident Report

3    Two photographs                                     31

4    Sketch depicting Oldsmobile and Nissan              48

5    Letter dated August 19, 2003                        77

1      MARYFE CULIAT

2    called as a witness by and on behalf of Plaintiffs, being

3    first duly sworn to tell the truth, the whole truth, and

4    nothing but the truth, was examined and testified as

5    follows:

6                          EXAMINATION

7    BY MR. WONG:

8    Q    Could you please state your full name.

9    A    Maryfe Alarcon Culiat.

10   Q    How do you spell the middle name and the last name?

11   A    A-l-a-r-c-o-n, C-u-l-i-a-t.

12   Q    As I introduced myself to you before, my name is

13   Wayson Wong.  I'm the attorney for Luan Trinh in a case

14   that was brought against you in the United States District

15   Court for the Territory of Guam.

16        As the attorney for Mr. Trinh, I have a right to ask

17   you questions at this particular proceeding, which is

18   called a deposition.  The first question I want to ask you

19   is, have you ever had your deposition taken before?

20   A    No.

21   Q    Have you and Mr. Lam discussed at least the

22   procedures by which a deposition is usually conducted?

23   A    Yes.

24   Q    I want to go over them again because I think it's

25   important that you understand fully what we want to do.

1       First of all, what we want to do is get your answers

2  to questions that you can understand.  If you don't

3  understand the question, just stop me or, if Mr. Lam asks

4  you question, stop him, and ask us what do we mean so we

5  can clarify the question and you can understand it before

6  you answer it.  All right?

7  A    Okay.

8  Q    It's really difficult sometimes to avoid shakes of

9  the head or nods of the head.  But as you can see, we have

10  a certified shorthand reporter taking down word for word

11  what we say.  It's difficult to take down accurately

12  sometimes a nod of the head or shake of the head.  So try

13  and make your answers out loud.  All right?

14  A    Okay.

15  Q    If you can answer the question yes, no or I don't

16  remember or in words that explain your answer, please do

17  so.  I'm going to ask you to try and avoid very common

18  words that we use in our conversation, like uh-huh and

19  uh-uh because they sound alike and the reporter may not be

20  able to accurately take down your testimony.  Okay?

21  A    Yes.

22  Q    I don't want you to questions.  But I do want you to

23  make reasonable estimates where you can.  I try and

24  explain to people what the difference between a guess and

25  a reasonable estimate would be.  You have lived in Guam

1  for many years, correct?

2  A    Yes.

3  Q    If I asked you for the average height of Japanese

4  male tourists over there, you would probably tell me about

5  5, 5, 5,6.  Just on the basis of what you see as far as

6  the tourists that come, that would be a reasonable

7  estimate.  But if I asked you the height of a martian,

8  that would be a guess, because I don't think you have ever

9  seen one, correct?

10  A    Yes.

11  Q    So understanding that difference, when I ask you for

12  a reasonable estimate, I'm going to ask you to try your

13  best to give me one based on what you saw or perceived or

14  heard or touched or smelled or tasted.  Okay?

15  A    Yes.

16  Q    During the course of your deposition, Mr. Lam may

17  object to a question that I ask.  If he does, stop and let

18  him place his objection on the record being taken down by

19  our court reporter.  And if you can remember the question,

20  go ahead and answer it.  If you can't remember it, ask me

21  to repeat it again, because in the discussion about the

22  objection, you may lose sight of the question.  All right?

23  A    Yes.

24  Q    Mr. Lam, as your attorney, has the right to instruct

25  you not to answer a question that he feels is improper.

1 And if he does instruct you, "Maryfe, don't answer this

2 question," do you agree to follow his instructions?

3 A    Yes.

4 Q    During the course of the deposition, if you need to

5 take a break, I don't think this will be that long, but if

6 you do, just let me know and we'll take a break.  If you

7 need to talk to Mr. Lam about a question, you may do so,

8 also.  All right?

9 A    Yes.

10 Q    At the close of your deposition, the court reporter

11 is responsible for putting it into a booklet form, in

12 which she will transcribe what I said, what you said, what

13 anybody else said during this deposition.  And you have a

14 right and an opportunity to review what you said and make

15 any changes or corrections you believe are necessary to

16 accurately reflect your testimony.  Do you understand

17 that?

18 A    Yes.

19 Q    But if you do make a change, I have a right to

20 comment, or anybody else involved in the case as an

21 attorney has a right to comment, before the finder of

22 fact, in this case, I believe it would be the judge, as to

23 what change you made and why you made the change.  Do you

24 understand that?

25 A    Yes.

1    Q    Do you have any questions for me about the procedures

2    that we will try and follow in your deposition?

3    A    No.

4    Q    What is your current residence address?

5    A    I currently reside at 1712 Poki Street, Apartment 3,

6    Honolulu, Hawaii 96822.

7    Q    How long have you lived there?

8    A    I believe I have lived there about a year.

9    Q    Where in Oahu is that located, what part of the

10   island, Manoa, St. Louis Heights?

11   A    It's in Makiki.

12   Q    What do you currently do now?  I think you are a full

13   time student at the University of Hawaii is, that correct?

14   A    Yes, I'm a full time student.

15   Q    Do you have a particular major?

16   A    I'm majoring in electrical engineer.

17   Q    Holmes Hall?

18   A    Yes.

19   Q    What year are you in electrical engineering?

20   A    I'm currently finishing up my third year.

21   Q    Do you plan to go on from your college education

22   there at the University of Hawaii to graduate school or

23   you haven't decided yet?

24   A    Currently I haven't decided.

25   Q    In terms of Guam, how often do you go back there now

1 | days within the last year?

2 | A    I haven't been back to Guam in the past year.

3 | Q    Do you plan on making any trip to Guam in the near

4 | future?

5 | A    Yes.

6 | Q    When?

7 | A    Probably, I believe, December of 2005.

8 | Q    The trial for this case in Guam is scheduled for July

9 | 5, 2005.  Have you been advised of that?

10 | A    Yes.

11 | Q    Do you have any problems in coming back to Guam for

12 | the trial?

13 | A    Yes.  I have an internship over the summer and I have

14 | to stay in Hawaii.

15 | Q    Is it working for an electrical engineering company?

16 | A    Yes.

17 | Q    What company is that?

18 | A    Pearl Harbor.

19 | Q    Actually it's the Pearl Harbor Naval Shipyard that

20 | you will be working at or interning at, is that right?

21 | A    Yes.

22 | Q    Do you know what division?

23 | A    No, I have not been placed yet.

24 | Q    And this is a summer internship?

25 | A    Yes.

1   Q   In the last year, have you worked part time or full

2   time at any other place?

3   A   Yes.

4   Q   Where do you work or where have you worked?

5   A   In the past year, I had a part time job at school.

6   Q   Doing what?

7   A   As an interchanger, an English tutor for Japanese

8   students.

9   Q   About how many hours a week was that?

10   A   I really don't recall because it was during the

11   summer of last year.

12   Q   Was it more full time than part time?

13   A   It was part time.

14   Q   Were you involved in a motor vehicle or car accident

15   on Christmas Eve 2000, December 24th, 2000?

16   A   I believe so on that date.

17   Q   If I use the date of the accident or the motor

18   vehicle or the accident, can you please understand me to

19   refer to the accident that you were involved in on

20   December 24, 2000 close to the Micronesia Mall?  Okay?

21   A   Yes.

22   Q   At the time of the accident, at least from the police

23   report, you were 16 years old, correct?

24   A   Yes.

25   Q   At what age did you get your driver's license in

1    Guam?

2    A    I don't recall because it's was a long time ago, but

3    it was around 15.

4    Q    I'm not sure what the legal age to get your license

5    is in Guam.  Is it 15?

6    A    They have changed the law.  I'm not sure what the law

7    is now.

8    Q    About how long had you been driving before this

9    accident had happened?

10            MR. LAM:  You means months, not minutes between

11    the start of her journey?

12            MR. WONG:  Right.

13            MR. LAM:  Do you understand the question?  How

14    many months prior to the accident did you obtain your

15    license, approximately?

16            THE WITNESS:  I'm not too sure.  It was a long

17    time ago.

18    Q    (By Mr. Wong)  Can you give us a reasonable estimate?

19    A    I could estimate about six months or more.

20    Q    Because your birth date is in August, correct?

21    A    Yes.

22    Q    And if it was six months in December, it probably was

23    you were about 15 years, ten months old at the time you

24    got your license.  Does that appear about right?

25    A    I'm not too sure.

1    Q    How did you get your license in terms of your

2    training?  Did you take any driver's education course?

3    A    Yes, I had driver's ed classes and I also did the

4    required number of driving hours with a licensed driver.

5    Q    Who did you do the driving hours with?

6    A    I don't remember.  It was a long time ago.

7    Q    Was it your family or was it outside?

8    A    It was the driver's ed teacher.

9    Q    Do you remember your driver's ed teacher?

10   A    No.

11   Q    Was it from school?

12   A    No, it was an outside business.

13   Q    In Harmon or Dededo?

14   A    I don't recall.

15   Q    In the period of time to get your license, about how

16   long were you driving?  I'm talking about from the time

17   you got your learner's permit to the time you got your

18   license.

19   A    I don't recall.  It was a long time ago.

20   Q    Okay.  You told us that you estimate that you had

21   your license for about six months or more.  Was the period

22   of time that you had your permit longer or shorter than

23   the period of time you had had your license before the

24   accident?

25   A    Can you repeat the question?

1   Q   Sure. You told us that you estimate that you had

2   been driving with a license for about six months or more

3   at the time of this collision. And I asked you the period

4   of time you had your learner's permit, was it longer or

5   shorter than the period of time you had your license

6   before the accident or collision?

7   A   I don't recall because I don't remember when I first

8   received my permit.

9   Q   On the day of the accident, you had been to the

10  Palace Hotel, is that correct?

11  A   Yes.

12  Q   What were you doing there?

13  A   The night before there was a school dance and I had

14  stayed the night at the hotel.

15  Q   You were on Christmas break at that time, is that

16  correct?

17  A   Yes.

18  Q   Did a bunch of friends stay with you at the hotel?

19  A   Yes.

20  Q   And as you left the hotel, you left with some of

21  those friends, is that correct?

22  A   Yes.

23  Q   Maria Taimanglo, was she one of the friends you left

24  the hotel with?

25  A   Yes.

```
 1   Q    A classmate of yours?

 2   A    A friend.

 3   Q    Did she go to the same school you did?

 4   A    Yes.

 5   Q    Elvin Cortez, another classmate?

 6   A    Yes.

 7   Q    And friend, correct?

 8   A    Yes.

 9   Q    Isebiu Reyes, a classmate and friend?

10   A    Yes.

11   Q    And Ms. Cruz, I can't read her first name--

12   A    Camarin Cruz, yes.

13   Q    Another classmate and friend?

14   A    Yes.

15   Q    All in the same grade as you were?

16   A    Yes.

17   Q    So there were five of you in your mother's car, is

18   that correct?

19   A    Including me, yes.

20   Q    And the car belonged to your mom, Fely Culiat?

21   A    Yes.

22   Q    The dance was Saturday night.  And on Sunday morning,

23   you headed over to Micronesian Mall, is that correct?

24   A    Yes.

25   Q    The police report indicates the accident happened at
```

1   about 12:30 in the afternoon on Sunday.  Is that your
2   recollection of the approximate time?
3   A    I don't remember.  It was a long time ago.
4   Q    You folks had checked out of the hotel already,
5   correct, or were you going to stay there longer?
6   A    I believe we checked out already.
7   Q    Why were you headed to the mall?
8   A    From what I recall, we were going to watch a movie.
9   Q    And then, after that, did you have any plans?
10  A    I don't recall.  It was a long time ago.
11  Q    So you probably took Marine Drive up to Micronesian
12  Mall, is that correct?
13  A    Yes.
14  Q    You made your right turn onto, I guess it's Route 16,
15  is that the road?
16  A    I don't remember.
17  Q    The road that leads from Marine Drive down towards
18  the Harmon McDonald's, that was the road you were on,
19  correct?
20  A    Yes.
21  Q    And then you got into the median lane to make a left
22  turn into Micronesian Mall, is that right?
23  A    Yes.
24  Q    And tell us what happened after that.
25  A    I was in the middle lane to make a left turn and I

1 saw a clearing in the road. I drove through two oncoming

2 lanes and the driver in the outer lane did not see me and

3 he hit me.

4 Q     Did you see the driver that hit you before he hit

5 you?

6 A     Yes.

7 Q     When you were in the median, had your car come to a

8 complete stop?

9 A     Yes.

10 Q    How long had it been at the stop before you attempted

11 your left turn?

12 A     I don't recall because it was a long time ago.

13 Q     Well, was it longer than a minute?

14 A     I cannot make an estimate because I don't remember.

15 Q     You mentioned that you went through an opening in

16 traffic, is that correct?

17          MR. LAM:  I think she testified that she saw a

18 clearing in traffic.

19 Q     (By Mr. Wong)  You saw a clearing in traffic, is that

20 correct?

21 A     Yes.

22 Q     So there was traffic coming up from, say, the Harmon

23 McDonald's towards Marine Drive at the time you were

24 trying to make your turn, correct?

25 A     Can you repeat that?

1  Q    Sure.  There was traffic coming up or cars coming up

2  headed towards Marine Drive at the time you were

3  attempting to make your turn, correct?

4  A    Are you talking about the oncoming lanes?

5  Q    Yes.

6  A    Yes, I believe so.

7  Q    Okay.  That's why you had to stop and wait, correct?

8  A    Yes.

9  Q    Because you needed to see a clearing before you were

10  going to make your left turn, correct?

11  A    Yes.

12  Q    Now, Sunday afternoon at Micronesian Mall, is it fair

13  to say there is quite a bit of traffic on that road on

14  that particular day?

15          MR. LAM:  Objection, lacks foundation, assumes

16  facts not in evidence, calls for speculation.  If you

17  understand the question, you can answer it.  I think

18  counsel is asking for your general observation, right,

19  counsel, and not at the particular time in day of that

20  accident?  Because that is two different things.

21      So if you are asking for her general observation as

22  to what her perception is as to the traffic pattern on

23  that road, I think she can answer that, if she recalls.

24          THE WITNESS:  I don't recall.

25  Q    (By Mr. Wong)  You don't recall what the usual

1    traffic was on Sunday afternoon by the Micronesian Mall?

2                MR. LAM:  It's kind of vague and ambiguous as to

3    any time any Sunday.  I think that's the problem.

4    Assuming that she can answer it, but I believe she said

5    she doesn't recall.

6                THE WITNESS:  I don't recall.

7    Q    (By Mr. Wong)  On the day of this particular

8    accident, at the time you were waiting to make that left

9    turn, was the traffic there light, medium or heavy, as far

10   as you can recall?

11               MR. LAM:  It's kind of vague and ambiguous as to

12   the traffic pattern--

13               THE WITNESS:  I can't remember.

14               MR. LAM:  If you understand the question, you

15   can try and answer it.

16   Q    (By Mr. Wong)  I'm going to show you a diagram that I

17   have made and ask you to take a look at it.  I'm going to

18   ask the court reporter to mark it Plaintiff's Exhibit 1

19   for identification.

20               (Exhibit 1 marked for identification.)

21   Q    (By Mr. Wong) Have you seen the police report for

22   this case?

23   A    No, I haven't.

24   Q    At the place where the accident happened, at least in

25   terms of the oncoming lanes in the median, there were four

1  lanes, is that correct?

2          MR. LAM:  Hold on for a second.  Exhibit 1 to

3  your deposition, this is, for the record, a diagram that

4  you prepared?

5          MR. WONG:  Yes.

6          MR. LAM:  Which depicts four lanes--

7          MR. WONG:  I will go over it.  I just want to

8  establish some background for her.

9          MR. LAM:  I don't know what it represents or

10  what it's supposed to depict, because we haven't seen a

11  copy of the police report either.

12          MR. WONG:  It's going to hopefully depict the

13  scene of the accident.

14  Q    (By Mr. Wong) Anyway, at the scene of the accident,

15  were there three lanes of oncoming traffic and a median

16  lane that you were stopped in?

17  A    Yes.

18  Q    And the entrance to the Micronesian Mall that you

19  were headed to was a driveway or roadway into the

20  Micronesian Mall to your left at the time you were going

21  to make your left turn, correct?

22  A    Yes.

23  Q    I drew a diagram to indicate four lanes of traffic

24  and I labeled them at the top of the diagram or bottom,

25  depending on how you look at it, lanes No. 1, 2, 3 and 4.

1    Do you see that?

2    A    Yes.

3    Q    And the lanes I have tried to separate with dashed

4    lines.   In terms of the median lane, which lane would that

5    be?

6              MR. LAM:   Counsel, it depends.   I assume you are

7    meaning that-- correct me if I'm wrong.   It's my

8    understanding that Route 16, the road that you represent

9    the accident occurred on, is actually a seven-lane road.

10             MR. WONG:   That's correct.

11             MR. LAM:   So the fourth lane-- this is not to

12   scale, and the other lanes on Route 16 are not included in

13   your diagram?

14             MR. WONG:   That's right.

15   Q    (By Mr. Wong)   Which lane would be the median lane,

16   lane four?

17   A    Lane four.

18   Q    And in terms of the roadway that you were turning

19   into to get to Micronesian Mall, was that a roadway that

20   allowed traffic to come in as well as go out of the mall?

21   A    As I recall, yes.

22   Q    So the width of the roadway that you were entering to

23   the Micronesian Mall, probably, as far as you can recall,

24   was at least two lanes such that cars could come in and

25   out, correct?

1    A    I don't recall.

2    Q    There was at least one lane in which you could go in,

3    correct?

4    A    Yes.

5    Q    In terms of approximately where your car had come to

6    a stop as you were waiting for a turn, can you point to us

7    on this particular diagram that I have marked or drawn

8    approximately where your car was stopped?

9    A    I don't recall.

10    Q    Were you stopped close to the entrance to the mall or

11    were you stopped far away?

12         MR. LAM:  Objection, vague and ambiguous.  I'm

13    not sure-- there is no reference points, counsel.  I guess

14    that is probably one of the problems.

15    Q    (By Mr. Wong)  Okay.  The arrow with "to Micronesian

16    mall" indicates what I believe to be the roadway that you

17    are talking about to enter Micronesian Mall.  I drew two

18    lanes over there because I wasn't sure, just like you are

19    not sure, whether there was ingress and egress at that

20    roadway.

21         But I know that there was enough room for at least

22    one car to come in on that particular roadway.  So I have

23    drawn in with an arrow the roadway to depict your ingress,

24    your entrance, into Micronesian Mall.  Do you see that?

25    A    Yes.

1    MR. LAM:  Counsel, to the extent that there has

2  been no foundation as to whether the entrance has one or

3  two lanes allowing an exit and an entrance, then I think

4  that it's improper to ask the questions relative to that

5  because it lacks foundation for which the witness can

6  testify to.  Because if there is one lane versus two

7  lanes, that does have some relevance to the location in

8  which she was going to enter the entrance.

9    But with that objection, and without waiving it, if

10  you can answer the question, go ahead.

11  Q    (By Mr. Wong)  I know you weren't attempting to enter

12  any lane that came out of Micronesian Mall.  You were

13  attempting to enter the lane going into the mall, correct?

14  A    Yes.

15  Q    Using that arrow as that particular lane as a

16  reference point and as a reference on this particular

17  diagram, can you give us a reasonable estimate of where

18  your car was, at least point me to it, in lane four at the

19  time just before you made your left turn?

20  A    I can't remember a reasonable estimate because I

21  don't recall.  It was a long time ago.

22  Q    I'm pointing to a place above the entranceway.  Were

23  you in that area?

24    MR. LAM:  Object to the question on the same

25  basis that I objected to with respect to the entrance.  If

1  there is no establishment as to whether it's ingress or

2  egress on this diagram, counsel, there is a question

3  that-- there is a problem with the question posed.

4  Q    (By Mr. Wong)  Let me show you the police report.

5          MR. LAM:  That is probably better.  If the

6  police report-- and we are not agreeing to the

7  authenticity of it.  But the police report was prepared by

8  whomever the author was and depicts the situation better

9  than yours.

10  Q    (By Mr. Wong)  Let me show you the police report.

11          MR. LAM:  Can I have a copy?

12          MR. WONG:  I'm going have the court reporter

13  mark it as Plaintiff's Exhibit 2 for identification.

14          (Exhibit 2 marked for identification.)

15  Q    (By Mr. Wong)  And I will show you the diagram in the

16  police report.  Do you see that?  It's on page four of the

17  police report.  Do you see that?

18  A    Yes.

19  Q    It shows the three lanes of your oncoming travel, is

20  that correct?

21  A    Yes.

22  Q    And those arrows point in the direction of where

23  Marine Drive would be, correct?

24  A    Yes.

25  Q    The police have indicated that that is the north

1  direction.  Do you see that?

2  A    Yes.

3  Q    I'm not going to ask you to agree or disagree with

4  the direction.  But I'm going to ask you to assume that

5  the lanes of travel towards Marine Drive, the oncoming

6  lanes for you, were headed in the north direction.  Okay?

7  A    Yes.

8  Q    So that would have meant that you were facing south

9  at the time just before you made your left turn, correct?

10  A    Yes.

11  Q    And you can see the police have indicated that the

12  entranceway that you were attempting to turn into is

13  actually two lanes, correct?

14  A    As indicated in the diagram, yes.

15  Q    One lane headed into the mall and another lane headed

16  out of the mall, correct?

17  A    Can you repeat that?

18  Q    Sure.  One lane headed into the mall and another lane

19  headed out of the mall, correct?

20         MR. LAM:  Counsel, I think the picture proposed

21  by the police report depicts that there were two separate

22  entrances and exits.  I think the question that you said

23  two lanes is not depicted accurately on the drawing.  In

24  fact, the police report indicate that there were two

25  entrance lanes and two exit lanes from that particular

1    point on the Micronesian Mall.

2    Q    (By Mr. Wong)  Do you see the two lanes that Mr. Lam

3    is talking about in each direction as far as the entrance

4    and exit to the mall?

5    A    Yes.

6            MR. LAM:  Assuming those are correct.  We don't

7    have any foundation for that.

8    Q    (By Mr. Wong)  Does the police report refresh your

9    recollection that there were at least one path of travel

10   into the mall and one path of travel out of the wall at

11   the place where you were trying to turn left?

12   A    Yes.

13   Q    Now, going ahead and looking at the police report,

14   can you show us the approximate location of where your car

15   was just prior to making a left turn into the mall?

16   A    I can't make an approximation.

17   Q    Was your car north of the right turn lane exiting

18   Micronesian Mall at the time just before you made the

19   turn?

20           MR. LAM:  Objection, vague and ambiguous.  Do

21   you understand what he is asking you?

22           THE WITNESS:  No.

23   Q    (By Mr. Wong)  If you drew an extension of the line

24   that says exit from Micronesian Mall on the forth page of

25   the police report, was your car on the north side of that

1 line just before you made your left turn?

2 A    I don't recall.

3 Q    If you drew an extension of the other line with the

4 words entrance to Micronesian Mall on this particular page

5 four of the police report, was your car to the south of

6 that line just before you made your left turn?

7         MR. LAM:  Same objection.  You can answer, if

8 you recall.

9         THE WITNESS:  I don't recall.

10 Q    (By Mr. Wong)  So as you sit here today, you have no

11 recollection at all where your car was in the median lane

12 just before you made your left turn, is that correct?

13 A    Yes.  It was a long time ago.

14 Q    Now, you mentioned that you waited for a clearing in

15 the traffic before you made your left turn, is that

16 correct?

17 A    Yes.

18 Q    Before you made your left turn, had you seen any car

19 in lane three?

20 A    I don't recall.  It was a long time ago.

21 Q    Before you made your turn, did you see any car in

22 lane two?

23 A    I don't recall.

24 Q    Before you made your turn, did you see any car in

25 lane one?

1  A    Yes.

2  Q    In terms of seeing the car in lane one, can you place

3  on this diagram that is marked as Plaintiff's Exhibit 1

4  the approximate location of where that car was in lane one

5  at the time you first saw it?

6       MR. LAM:  Objection.  Exhibit 1 is not to

7  scale.  There is no landmarks or any other discernible

8  information that would allow the witness to answer that

9  question reasonably and credibly at this point.

10      MR. WONG:  I disagree with you.  There is that

11 corner of the entranceway to Micronesian Mall that

12 Maryfe's lane was at.  That is a place that she can

13 reference, and the lanes of travel on the roadway are as

14 in the police report in Plaintiff's 1 and those are

15 references that she can use.

16      MR. LAM:  You have asked her to use Exhibit 1 to

17 answer the question posed, which was, using Exhibit 1,

18 identify, if she is able to, the point in lane one of your

19 diagram where she believes she first saw a car, whether

20 it's the plaintiff's car or not, but a car.

21      The problem there is that, in relation to Exhibit 1,

22 it's not to scale.  So if you are asking her to place the

23 car in relation to the corner of what is depicted as the

24 entrance to the mall on Exhibit 2, diagram four, that is

25 quite a bit smaller diagram than your Exhibit 1 is.

1    So I believe the objection is that Exhibit 1 lacks

2  foundation as far as accuracy.  And if you are trying to

3  pinpoint where she believes she first saw the car--

4        MR. WONG:  I didn't ask for pinpoint, counsel.

5  I just said approximate location.

6        MR. LAM:  Still the same objections, lacks

7  foundation, calls for speculation and it's not to scale,

8  and therefore can be deemed to be completely inaccurate

9  and without foundation.

10  Q   (By Mr. Wong)  Maryfe, do you know approximately how

11  wide a road is?  Ten feet, fair enough?

12        MR. LAM:  You mean a lane?

13        MR. WONG:  Yes.

14        THE WITNESS:  I do not know.

15  Q   (By Mr. Wong)  In your engineering background, you

16  have never come across, especially if you have taken civil

17  classes, the approximate roadway or lane width?

18        MR. LAM:  That assumes that the width of the

19  road, if she studied it in the State of Hawaii, is similar

20  to that in the Territory of Guam, and there has been no

21  foundation for that.  Objection, lacks foundation, calls

22  for speculation.

23  Q   (By Mr. Wong)  Do you know approximately how wide the

24  lanes are as far as this area of Route 16?

25  A   No, I cannot give an approximation.

1  Q     Would ten feet be a reasonable approximation?

2           MR. LAM:  Objection, assumes facts not in

3  evidence.  Assumes she made any kind of independent

4  determination as to that question.

5        You can answer it, if you know.

6           THE WITNESS:  I really don't know.

7  Q   (By Mr. Wong)  Maryfe, you have driven on the

8  roadways of Oahu and Guam for over five years, is that

9  correct?

10          MR. LAM:  Objection, assumes facts not in

11  evidence.

12  Q   (By Mr. Wong)  Well, four years, then.

13          MR. LAM:  Same objection.  You haven't

14  established whether she is even driving.

15          MR. WONG:  Can you let her answer.

16          MR. LAM:  That is the objection, lack of

17  foundation.

18  Q   (By Mr. Wong)  Have you driven on the roadways of

19  Guam and Oahu for over four years?

20          MR. LAM:  Same objection, compound.

21          THE WITNESS:  Can you repeat the question?

22  Q   (By Mr. Wong)  Sure.  Have you driven on the roadways

23  of Guam and Oahu for over four years?

24          MR. LAM:  Same objection.

25  Q   (By Mr. Wong)  It's not a hard question.

1    MR. LAM:  As posed it's compound and confusing,

2  since there has been no establishment that she is even

3  driving in the State of Hawaii and, therefore, it's an

4  objectionable question.

5        You can answer if you understand it.  You can ask him

6  to rephrase it.

7              THE WITNESS:  I don't understand the question.

8  Q    (By Mr. Wong)  Have you driven on the roadways of

9  Oahu?

10  A    No.

11  Q    Okay.  Have you driven on the roadways of Guam?

12  A    Yes.

13  Q    Have you ridden on the roadways of Oahu?

14  A    Yes.

15  Q    Do you understand that the roadways that we have in

16  Guam and Oahu are approximately ten feet wide?

17              MR. LAM:  Same objection.

18  Q    (By Mr. Wong)  As far as the lanes of travel are

19  concerned.

20              MR. LAM:  Lack of foundation.

21              THE WITNESS:  I don't know.

22  Q    (By Mr. Wong)  I know you don't know.  I'm asking you

23  for a reasonable estimate.

24              MR. LAM:  Don't answer that.  I have already

25  posed the objection.  She has already stated she doesn't

1  know.

2  Q    (By Mr. Wong)   Do you know the approximate length of

3  a car?

4        MR. LAM:   Vague and ambiguous, lacks

5  foundation.   Could be any car, Wayson.

6  Q    (By Mr. Wong)   In terms of the car that was being

7  driven by Mr. Trinh, was that a Nissan?

8  A    I don't recall.   It was a long time ago.

9  Q    Okay.   I'm going to show you a picture, actually two

10  pictures, that I will ask the court reporter to mark as

11  Exhibit 3.

12        (Exhibit 3 marked for identification.)

13  Q    (By Mr. Wong)   Do you recognize at least one of the

14  cars in those pictures?

15  A    Yes.

16  Q    It's your car, right?

17  A    It was owned by my mother, yes.

18  Q    It was the car that you were driving at the time of

19  the accident?

20  A    Yes.

21  Q    I'm going to mark the photos as photo A and photo B

22  to the right side of each photo.   Does photo B show you,

23  at least the back of you, talking to the police officer?

24  A    Yes.

25  Q    Do photos A and B show the location of how and where

1  your cars came to rest after the impact?

2      MR. LAM:  Counsel, the photographs speak for

3  themselves.  There is no foundation as to distance and

4  whether those distance are accurate.  But they depict what

5  they depict, which are two cars stuck together.

6  Q   (By Mr. Wong)  Could you answer my question, please?

7  A   Could you repeat the question?

8  Q   Sure.  Do photos A and B show where the cars came to

9  rest after the impact?

10      MR. LAM:  Same objection.  They are what they

11  are.  You can answer, if you know.

12      THE WITNESS:  The photos show where they came to

13  rest but not in relation to any other references.

14  Q   (By Mr. Wong)  I just asked where they came to rest,

15  if it shows where they came to rest.  I didn't ask about

16  any other references.

17      So the photos show where the vehicles or two cars

18  came to rest after the impact, correct?

19  A   Yes.

20  Q   Now, the other car that was involved in this accident

21  was a Nissan Sentra?

22      MR. LAM:  If you know.

23      THE WITNESS:  I don't recall.

24  Q   (By Mr. Wong)  Well, you can see it in there, right?

25      MR. LAM:  She can see a car, but it doesn't

1  specify what type of make or model, counsel.

2  Q   (By Mr. Wong)  I will show you another photograph,

3  actually two photos.  One has a photograph ORKDLVR.  Is

4  that your license plate or your mother's license plate?

5  A   Yes.

6  Q   What does that mean?

7  A   It means orchid lover, because my mother loves

8  orchid.

9  Q   And the other car, as you can see, is the same car

10  that is shown in Exhibit 3A and B, and you can see the

11  type of car that it is on this other photograph, correct?

12  A   Yes.

13  Q   It looks like a Nissan, correct?

14  A   Yes.

15  Q   From what you recall in terms of this accident, was

16  the Nissan that was involved in the accident somewhere

17  between 10 and 15 feet long?

18        MR. LAM:  Objection, calls for speculation.

19        THE WITNESS:  I don't recall.  It was a long

20  time ago.

21  Q   (By Mr. Wong)  But looking at a reasonable estimate

22  for vehicles like that, and you have seen others on the

23  road, would it be fair to say that it was about 10 or 15

24  feet long?

25        MR. LAM:  Same objection, lacks foundation.

1        THE WITNESS:  I can't make any estimates.

2    Q    (By Mr. Wong)  All right.  Now, you say that the

3    Nissan was in lane No. 1 and you saw it before you made

4    your turn, correct?

5    A    Yes.

6    Q    At the time you first saw it, how fast was it

7    traveling?

8    A    I can't make any estimates.  I don't remember.

9    Q    Do you have any idea at all how fast it was traveling

10   at the time you first saw it?

11   A    No.  It was a long time ago.

12   Q    You said the Nissan hit your car, right?

13   A    Yes.

14   Q    At the time it hit your car, do you have any idea how

15   fast it was traveling?

16   A    No.

17   Q    It's one thing for the cars to come into contact, hit

18   each other.  But I'm looking for the split second before

19   the impact happened.  Do you understand?

20   A    Yes.

21   Q    In the split second before the impact happened, do

22   you have any idea how fast the Nissan was traveling?

23   A    No.

24   Q    So you can't tell us whether it was going 15 miles an

25   hour or 35 miles an hour?  You just have no idea, is that

1 correct?

2 A    Yes, I can't make an estimate.

3 Q    As far as you are concerned, did the driver of the

4 Nissan do anything wrong to cause this accident?

5          MR. LAM:  Objection, calls for a legal

6 conclusion, assumes facts not in evidence.

7          THE WITNESS:  Can you repeat the question.

8 Q    (By Mr. Wong)  Sure.  As far as you are concerned,

9 did the driver of the Nissan do anything wrong to cause

10 this accident?

11          MR. LAM:  Same objection.

12          THE WITNESS:  I don't know how to answer that

13 question.

14 Q    (By Mr. Wong)  Do you know one way or the other?

15 A    I'm sorry.

16 Q    Do you know one way or the other whether the driver

17 of the Nissan did anything wrong to cause this accident?

18          MR. LAM:  Same objection, assumes facts not in

19 evidence, calls for a legal conclusion and calls for

20 speculation as to what activities the plaintiffs may have

21 been engaged in at the time.

22      You can answer the question, if you can, otherwise,

23 don't guess.

24          THE WITNESS:  I can't understand the question.

25 Q    (By Mr. Wong)  Do you know as you sit here today

1  anything the driver of the Nissan did wrong to cause the
2  collision?

3         MR. LAM:  Same objection, vague and ambiguous,
4  calls for a legal conclusion, assumes facts not in
5  evidence, calls for speculation.

6         THE WITNESS:  I can't answer the question.
7  Q   (By Mr. Wong)  Why can't you answer the question
8  about what you know today?  I'm not asking you to figure
9  out what happened then.  I'm just asking you, as you sit
10 here today, can you tell us and the judge in this case
11 what the driver of the Nissan did wrong, as far as you
12 know, to cause the collision?

13        MR. LAM:  Assumes facts not in evidence, calls
14 for speculation, calls for a legal conclusion.  At this
15 time, based on what you are telling us, it's irrelevant
16 since you have asked her five years hence whether or not
17 she has any opinion as to whether the driver of the car
18 did anything wrong.

19    So with that objection, I'm instructing you not to
20 answer.

21        MR. WONG:  I'm not asking for an opinion,
22 counsel.  I'm asking for her knowledge now.  I'm entitled
23 to know her knowledge now.

24        MR. LAM:  She has testified that she cannot
25 answer that question.

1  Q   (By Mr. Wong)   Maryfe, is it true that you do not

2  know of any facts to indicate that the driver of the

3  Nissan did anything wrong to cause this collision, is that

4  true?

5       MR. LAM:   Misstates her testimony, objection. I

6  need to talk to my client.

7       MR. WONG:   Okay.   Go ahead.

8       (Recess)

9       MR. WONG:   Counsel, I'm going to make a request

10 that you limit your objections, rather than giving us

11 speaking objections, to just the ground by your objection.

12 Q   (By Mr. Wong)   In terms of what you saw of the car

13 that hit yours, you said you saw it for the first time,

14 and I didn't ask you, did you see it at the time the two

15 cars came into contact?

16 A   Can you repeat that?

17 Q   Sure.   Did you see the car that hit you at the time

18 it came into contact with yours?

19 A   Yes.

20 Q   I know you saw it twice, once when it was down the

21 road and another time when it hit you, correct?

22 A   Yes.

23 Q   Did you continue to watch it from the time you first

24 saw it to the time it hit you or did you take your vision

25 off that car at some time during that interval?

1  A    I don't recall.

2  Q    So you don't know whether you watched the car at the

3  time you first saw it to the time it hit you or whether

4  you only saw it twice, once when you first saw it and the

5  second time when it hit you, is that correct?

6  A    I don't recall.  It was a long time ago.

7  Q    Did the car that hit you ever move out of lane one at

8  any time prior to it hitting you?

9  A    I don't know.

10  Q    Do you know anything that the driver of the car that

11  hit you did wrong to cause the collision involved?

12       MR. LAM:  Objection, vague and ambiguous,

13  assumes facts not in evidence, calls for a legal

14  conclusion.  Subject to those objections, without waiving

15  them, you may answer the question, if you can.

16       THE WITNESS:  All I know is I made a safe turn

17  and I was hit.

18  Q    (By Mr. Wong)  That is not the question I asked you.

19  Do you know of anything that the driver that was driving

20  the car that hit you did wrong to cause the collision?

21       MR. LAM:  Same objection.  Plus the question is

22  badgering the witness.  She has testified accordingly.

23       THE WITNESS:  I was hit.

24  Q    (By Mr. Wong)  Do you know anything the other driver

25  did wrong?

1　　　　MR. LAM:　Same objection.　Don't answer that
2　question.　Asked and answered.　Proceed on, counsel.
3　Q　(By Mr. Wong)　Have you or your attorneys contended
4　in this case that Mr. Trinh did something wrong in causing
5　the collision involved?
6　　　　MR. LAM:　Objection, assumes facts not in
7　evidence, calls for a legal conclusion, violates the
8　attorney/client privilege.　Don't answer that question.
9　The pleadings speak for themselves.
10　Q　(By Mr. Wong)　Have you told anyone that Mr. Trinh
11　did something wrong to cause the collision involved?
12　　　　MR. LAM:　Same objection.
13　Q　(By Mr. Wong)　Maryfe, you can answer the question.
14　　　　MR. LAM:　Same objection, same instruction.
15　　　　MR. WONG:　Counsel, I think those two questions
16　that I asked that you instructed her not to answer are
17　good questions, proper questions and fair questions to ask
18　this witness.
19　　　　MR. LAM:　I will just point out the fact that
20　perhaps this is the reason why I asked that question
21　earlier on.　There are answers to interrogatories
22　submitted by the defendant, Maryfe, to plaintiffs'
23　questions, and I assume you have seen them.　But in answer
24　to Interrogatory No. 11, the defendant witness states,
25　quote, "I'm not sure of everything which occurred during

1   the accident.  I, however, recall I was in the middle lane

2   waiting to turn left into the Micronesian Mall.  I saw a

3   clearing and drove through two oncoming lanes without any

4   problem.  Apparently the driver in the outer lane failed

5   to see me (I was almost through with my turn) and hit me."

6       So that is the same response to your question and the

7   same objection as to why the question that you posed is

8   objectionable.

9       So I'm instructing her not to answer that question.

10  Q    (By Mr. Wong)  Maryfe, do you know if the other

11  driver that hit you failed to see you?  Do you know that

12  one way or the other?

13          MR. LAM:  It's stated in her interrogatories.

14  Q    (By Mr. Wong)  Do you know that, Maryfe?  Please

15  answer the question.

16  A    Can you repeat that?

17  Q    Sure.  Do you know that the other driver that hit you

18  failed to see you or is that an assumption on your part?

19  A    I know that I made a safe turn.

20  Q    That is not the question that was asked of you,

21  Maryfe.

22  A    I believe he failed to see me.

23  Q    What is your basis for that belief?

24  A    Because I made a safe turn.

25  Q    Is there any other basis besides that?

1  A    I don't know.

2  Q    When you say you made a safe turn, what is the basis

3  for you saying you made a safe turn?

4  A    Can you repeat that?

5  Q    Sure.  At the time you were driving and this

6  collision occurred, did you understand that the oncoming

7  traffic going straight had the right of way?

8         MR. LAM:  Objection, assumes facts not in

9  evidence, lacks foundation.

10        You can answer that question if you understand.

11        THE WITNESS:  Can you say that again?

12 Q    (By Mr. Wong)  Sure.  At the time of this collision,

13 as you are waiting to make your left turn, did you

14 understand that the oncoming traffic in the lanes I have

15 marked 1, 2 and 3 on Exhibit 1 had the right of way?

16 A    Yes.

17 Q    Did you understand in making a left turn from the

18 median lane, lane No. 4, as I have marked in Exhibit 1,

19 you were required to yield to the oncoming traffic coming

20 straight towards Marine Drive, correct?

21        MR. LAM:  Objection, assumes fact not in

22 evidence, misstates the law, calls for a legal conclusion.

23        You may answer the question if you can.

24 Q    (By Mr. Wong)  Did you understand that at the time of

25 this collision?

1    A    Can you repeat the question again?

2    Q    Sure.  At the time of this collision as you were

3    about to make your left turn across three lanes of travel

4    of oncoming traffic, did you understand that you were

5    required to yield to that oncoming traffic?

6              MR. LAM:  Same objections.

7              THE WITNESS:  Yes.

8    Q    (By Mr. Wong)  Did you yield to the Nissan traveling

9    in lane No. 1 headed toward you?

10   A    Yes.

11   Q    Did you let that Nissan go by your car safely as it

12   was going straight on its lane of travel, Route 1?

13             MR. LAM:  Objection, assumes facts not in

14   evidence, lacks foundation.

15        You can answer the question

16             THE WITNESS:  I don't understand the question.

17   Q    (By Mr. Wong)  Did you let the Nissan go by your car

18   as it was traveling on lane No. 1 going straight before

19   you made your left turn?

20             MR. LAM:  Objection, irrelevant, assumes facts

21   not in evidence, asked and answered.

22             THE WITNESS:  What?

23             MR. LAM:  Asked and answered.  You may answer

24   that again, if you can, subject to the objections posed.

25             THE WITNESS:  Can you make that more clear?

1    Q    (By Mr. Wong)   Did you let the Nissan that hit your

2    car go by you?   In other words, did you yield to it?

3           MR. LAM:   Objection, assumes facts not in

4    evidence, lacks foundation, calls for a legal conclusion,

5    asked and answered.

6           THE WITNESS:   I don't how to answer that

7    question.

8    Q    (By Mr. Wong)   Yes or no.

9           MR. LAM:   Same objection.   The photos speak for

10    themselves, Wayson.   It's not so much the-- as the

11    question is posed, I'm going to instruct her not to answer

12    that question.

13    Q    (By Mr. Wong)   Yielding to you means letting the

14    traffic go ahead of you, correct?

15           MR. LAM:   Objection, misstates the law, assumes

16    facts not in evidence, calls for speculation.

17    Q    (By Mr. Wong)   Can you please answer that question?

18           MR. LAM:   Same objection.

19    Q    (By Mr. Wong)   Mr. Lam can object to his heart's

20    content, but the law requires you to answer the question.

21           MR. LAM:   Unless I instruct her otherwise.   And

22    to the extent the question calls for a legal conclusion--

23           MR. WONG:   I didn't ask for a legal conclusion.

24           MR. LAM:   Yes, you did.

25    Q    (By Mr. Wong)   Okay.   Maryfe, what does--

1        MR. LAM:  The question calls for a legal

2   conclusion and counsel is misrepresenting the current

3   status of the law in Guam with respect to oncoming traffic

4   and yielding.  Therefore, the question is objectionable

5   and I'm instructing the witness not to answer.

6   Q   (By Mr. Wong)  What does yield mean to you as you

7   used it earlier?  Does it mean to allow the oncoming

8   traffic to go past you before you make your turn?  Does it

9   mean that to you?

10       MR. LAM:  Do you need to talk to me?  Do you

11  understand the question?

12       THE WITNESS:  No, I don't understand.

13       MR. WONG:  Let the record note that we had 30

14  seconds of silence go by.

15  Q   (By Mr. Wong)  All I asked is, when you used the word

16  yield earlier in your answer--

17       MR. LAM:  Counsel, just a minute.

18    Do you want to speak to me about the question being

19  asked of you?

20       MR. WONG:  Why don't you let me ask the question

21  first, then maybe you guys can talk about it.

22  Q   (By Mr. Wong)  What did the word yield mean to you

23  when you used it in your answer?  Did it mean to allow the

24  oncoming traffic in lanes 1, 2 and 3 to go by you before

25  you made your turn?  Yes, no or I don't know.  And you may

1   consult with your attorney about that.

2           MR. LAM:   Thank you.

3           (Recess)

4   Q    (By Mr. Wong)   So when you used the word yield

5   earlier in your answer, did you mean to let the oncoming

6   traffic to go by before you made your left turn?

7   A    I did not yield to him.

8   Q    Is that what you meant when you used the word yield

9   earlier?

10  A    Yes.

11  Q    How fast were you traveling at the time of the impact

12  between the two cars?

13  A    I can't make an estimate.

14  Q    Can you estimate more than 25 miles an hour or less

15  than 25 miles an hour?

16  A    I cannot make any estimates.

17  Q    Okay.  I don't think you played war with your

18  brother, or maybe you have.  This is what I'm going to

19  do.  I have a stopwatch over here.  I'm going to go back

20  to my stop time.  I don't want you to see how fast I ran

21  two miles yesterday because it's kind of bad.  But I'm

22  going to show you what is five seconds.  Okay.

23       You saw five seconds on my stopwatch, right?

24  A    Yes.

25  Q    I want to take you back to the time you first saw the

1   car that hit you. I want to take you to the time that you
2   saw it impact with your car. Okay?
3   A   Okay.
4   Q   There is a time interval between then, right?
5   A   Yes.
6   Q   Was the time interval greater or less than five
7   seconds?
8   A   I cannot make any estimates. It was a long time ago.
9   Q   So you don't know whether it was greater than five
10  seconds or less than five seconds for the time interval
11  between the time you first saw the car that hit you and it
12  hit you, correct?
13  A   I can't make an estimate.
14  Q   Is the answer to my question yes? Was I correct?
15  A   Yes.
16  Q   All right. Can you at least give us a
17  characterization of the time? Can you tell us whether it
18  seemed short to you or long to you? Can you even recall
19  that?
20  A   I cannot recall.
21  Q   All right. When you first saw the car that hit you,
22  did you see any other cars in front of it in lane No. 1?
23  A   I cannot recall. It was a long time ago.
24  Q   Did you see any cars behind of it in lane No. 1?
25  A   I can't recall.

1  Q    When you looked down the road, again, in your mind's

2  eye, and see that car that hit you in lane No. 1, do you

3  see any other cars in lanes No. 1, 2 or 3 as you are

4  looking down the road to see that car in lane No. 1?

5          MR. LAM:  Objection, vague and ambiguous as to

6  time.  I assume you mean before she turned left?

7          MR. WONG:  Yes.

8  Q    (By Mr. Wong)  At the time she is looking down the

9  road and first sees the car in lane No. 1, do you see any

10 other cars in any other lane?

11 A    I can't recall.

12 Q    Did you injure yourself in this accident?

13 A    As far as I recall, no.

14 Q    Did you have any memory problems after this accident

15 in terms of what memory you had before the accident and

16 what memory you had after the accident?

17 A    No.

18 Q    In terms of your schoolwork at the University of

19 Hawaii, how would you categorize yourself, a C student, a

20 B student, an A student?

21         MR. LAM:  Objection, relevance.  You can answer

22 that, subject to the objection.

23         THE WITNESS:  I would say a B.

24 Q    (By Mr. Wong)  Are you able to draw for me the

25 placement and positions of the cars when they first came

1  into contact?

2  A    Can you repeat that?

3  Q    Sure.  Are you able to draw for me the placement and

4  position of the cars when they first came into contact?

5  A    No.

6  Q    For instance-- I'm going to go off the record for

7  now.

8              (Discussion held off the record.)

9              (Exhibit 4 marked for identification.)

10  Q    (By Mr. Wong)  I'm going to show you what has been

11  marked as Exhibit 4.  What I'm trying to understand from

12  you, if you can tell me or show me, is how the cars came

13  into contact.  I have got photographs of what I believe

14  are the resting place of the cars.  But sometimes, when a

15  collision occurs, the cars move beyond the initial point

16  of impact to their resting place.

17         What I'm interested in finding out from you is if you

18  can help us understand how the two vehicles came into

19  contact.  I have drawn on what I have marked as

20  Plaintiff's Exhibit 4, just a rough diagram of two

21  rectangles to represent two cars, the Oldsmobile that you

22  were driving and the Nissan that Mr. Trinh was driving.

23  And I have placed them, just as a guesstimate, in line

24  where it shows that the Nissan hit the Oldsmobile and the

25  Nissan's front driver's side fender is coming into contact

1  with the Oldsmobile's passenger side front fender.  Do you

2  see that?

3  A    Yes.

4  Q    I'm asking you whether you could take a piece of

5  paper and better show us how the two cars really came into

6  contact upon the initial impact, since you saw the Nissan

7  hit your car and you knew where your car was by driving.

8  Can you do that?

9         MR. LAM:  Objection as to the diagram or the

10  request based on what she has testified to.  I think the

11  question is asking for information that is irrelevant

12  based on the exhibits and the accident reports that were

13  established in this case.

14      With those objections stated, the witness can try to

15  answer that question, if she can.

16  Q    (By Mr. Wong)  Can you draw for me how the cars came

17  into contact?

18  A    I don't recall.

19  Q    Can you show me-- after the cars came into contact,

20  did they move in any way before coming to rest?

21  A    I don't recall.

22  Q    So you can't tell me whether the photographs on

23  Exhibit 3A and B show the point of impact and the resting

24  place or just show the resting place with a different

25  point of impact not being shown, is that correct?

1  A    Can you repeat that?

2  Q    Sure.  Sorry if that question was confusing.  The

3  photographs, as far as you know, you can't tell whether

4  these photographs show both the point of impact and the

5  final resting place of the vehicles or just the final

6  resting place with a different point of impact, correct?

7           MR. LAM:  Objection as to form insofar as I

8  suspect you use point of impact meaning location in the

9  road in relation to where photograph 3B is, not point of

10  impact as to car upon car?

11           MR. WONG:  Correct.

12           MR. LAM:  With that clarification, if you can

13  answer that question, you may, if you can.

14           THE WITNESS:  Can you repeat that again?

15  Q    (By Mr. Wong)  Sure.  As far as you know, you can't

16  tell whether there was a different point of impact from

17  the place these cars came to rest on the roadway, is that

18  correct?

19  A    Yes.

20  Q    On page four of the police report, the police officer

21  indicates that the two cars came to rest just in front of

22  the end of the concrete median of the entrance and exit to

23  Micronesian Mall.  Do you see that?

24  A    Yes.

25  Q    Is that where you recall the cars came to rest?

1   A    I don't recall.

2   Q    You say that the other driver hit your car, is that

3   correct?

4   A    Yes.

5   Q    Is it equally true that your car hit the other

6   driver's car?

7            MR. LAM:  Objection, calls for a legal

8   conclusion.  You can answer that question to the extent

9   that it doesn't call for a legal conclusion.

10           THE WITNESS:  Can you say that again?

11  Q    (By Mr. Wong)  Sure.  Is it equally true that your

12  car hit the other driver's car?

13  A    Yes, the two cars collided.

14  Q    There was damage to the front of your car, is that

15  correct?

16  A    Based on the picture, yes.

17  Q    The damage I see is to the driver's side front of

18  your car.  Is that where you recall it?

19           MR. LAM:  Excuse me.  You said--

20  Q    (By Mr. Wong)  I'm sorry.  I'll withdraw that

21  question.  The damage I see in the photographs is to the

22  passenger side front of your car.  Is that where you

23  recall it?

24  A    Yes.

25           MR. LAM:  Based on the photograph?

1    THE WITNESS: Based on the photograph.

2  Q    (By Mr. Wong)  And the major damage your car did to

3  the other car was to the front driver's side fender of the

4  other car, correct?

5    MR. LAM:  The picture speaks for itself,

6  assuming that it's properly admitted.  You can answer that

7  question if you can, if you have any personal knowledge.

8    THE WITNESS:  Based on the picture, yes.

9  Q    (By Mr. Wong)  Do you know if there was any damage to

10  the front bumper or front grill area of the other car?

11  A    I don't recall.

12  Q    Was your car repaired?

13  A    Yes.

14  Q    Do you recall how much the repair costs were?

15  A    I don't know.  My parents took car of it.

16  Q    Did you later learn that the driver of the other car

17  was Mr. Luan Trinh?

18  A    What was that?

19  Q    Did you later learn that the driver of the car, I'm

20  talking about the Nissan, was Mr. Luan Trinh?

21  A    Yes.

22  Q    And to the best of your recollection, Mr. Trinh was

23  heading straight on lane No. 1 as shown in Exhibit 1 just

24  before this collision, correct?

25    MR. LAM:  Objection, vague and ambiguous,

1    calling for speculation, misstates her testimony.

2    Q    (By Mr. Wong)    Correct?

3    A    Can you repeat that?

4    Q    Sure.    To the best of your knowledge, Mr. Trinh was

5    heading straight towards Marine Drive on lane No. 1 as

6    shown on Exhibit 1 at the time just before the collision,

7    correct?

8          MR. LAM:    Same objection.

9          THE WITNESS:    Yes.

10    Q    (By Mr. Wong)    When you were making your left turn

11    and collided into the Nissan Sentra, you violated the

12    right of way of the driver of the Nissan Sentra, is that

13    correct?

14          MR. LAM:    Objection, calls for a legal

15    conclusion, misstates this witness's testimony, assumes

16    facts not in evidence.    I'll instruct the witness not to

17    answer that question as posed.

18          MR. WONG:    The question is a perfectly fine

19    question to be answered.

20          MR. LAM:    I object and I'm instructing you not

21    to answer based upon the objections raised.

22    Q    (By Mr. Wong)    At the time of this collision, you had

23    the responsibility to other drivers on the road with you

24    to act with proper care in driving your car, is that

25    correct?

1    A    Can you repeat that?

2    Q    Sure.  At the time of the collision, you had the

3    responsibility to other drivers on the road with you to

4    act with proper care in driving your car?

5    A    Yes.

6    Q    When you were making the left turn and collided into

7    the Nissan Sentra, you failed to meet your responsibility

8    to Mr. Trinh to act with proper care in driving your car,

9    correct?

10         MR. LAM:  Objection, calls for a legal

11   conclusion, assumes facts not in evidence, argumentative,

12   misstates the witness's testimony.  I'll instruct her not

13   to answer as posed.

14         MR. WONG:  I think this is a fine question or

15   proper question to ask her.

16   Q    (By Mr. Wong)  When you were making your left turn

17   and collided into Nissan Sentra, you were negligent with

18   respect to Mr. Trinh, is that correct?

19         MR. LAM:  Objection, calls for a legal

20   conclusion, assumes facts not in evidence.  I'll instruct

21   this witness not to answer the question.

22         MR. WONG:  Again, I think it's a proper

23   question.

24   Q    (By Mr. Wong)  When you collided into the Nissan

25   Sentra, you caused damages to the Nissan, correct?

1    MR. LAM:  Same objection with respect to assumes

2  facts not in evidence, misstates this witness's

3  testimony.  The evidence speaks for itself with respect to

4  damages.

5  Q    (By Mr. Wong)  Please answer the question.

6    MR. LAM:  I'm instructing you not to answer that

7  question.

8    MR. WONG:  Again, a proper question.

9  Q    (By Mr. Wong)  Did Mr. Trinh indicate in any way that

10  he was injured?

11    MR. LAM:  At what time, counsel?

12    MR. WONG:  At any time.

13    MR. LAM:  Including the lawsuit that was filed

14  alleging damages--

15    MR. WONG:  I'm talking about at the scene of the

16  accident.

17    MR. LAM:  That is why I asked you, at what point

18  in time?

19    THE WITNESS:  I don't recall.

20  Q    (By Mr. Wong)  Did an ambulance come to the scene of

21  the accident?

22  A    I don't recall.

23  Q    Have you ever talked to any of the people in your car

24  about what happened at the scene of the accident?

25  A    Yes.

1   Q    Who?

2   A    I don't recall.

3   Q    What did you tell them?

4   A    I don't recall.

5   Q    What did they tell you?

6   A    I don't recall.

7   Q    Did you ever see any written statements by any of

8   them about this collision?

9   A    No.

10   Q    Do you know where these people currently are?

11   A    I'm sorry?

12   Q    Do you know where these people currently are?  Maria,

13   for instance, do you know where she is?

14   A    I'm not too sure but-- I'm not too sure.

15   Q    When was the last time you talked to her and where

16   was she when you talked to her?

17   A    I don't recall.

18   Q    Do you know if she is still on Guam?

19   A    I don't know.

20   Q    How about Elvin, is he still in Guam?

21   A    No.

22   Q    Where is he?

23   A    He is in Hawaii.

24   Q    Is he going to school at the University?

25   A    Yes.

1   Q   Is he in your college?

2   A   I'm sorry?

3   Q   Is he in your College of Engineering?

4   A   No.

5   Q   Do you occasionally contact him?

6   A   What do you mean by occasionally?

7   Q   Call him up on the telephone and ask how he is.

8   A   No.

9   Q   Do you happen to know his address or phone number?

10  A   No.

11  Q   Isebiu, do you know if he is still on Guam?

12  A   He is not in Guam.

13  Q   Where is he?

14  A   He is in California.

15  Q   Doing what?

16  A   I don't know.

17  Q   You haven't had any contact with him probably for the

18  last year, is that correct?

19  A   Yes.

20  Q   What about Camarin, is she still on Guam?

21  A   No.

22  Q   Where is she?

23  A   She is in California.

24  Q   Have you had any contact with her over the last year?

25  A   No.

page number

1    Q    Did the police officer tell you that you had failed

2    to yield in violation of Guam law?

3              MR. LAM:  Objection, assumes facts not in

4    evidence, lacks foundation.

5         You may answer that, if you recall.

6              THE WITNESS:  I don't recall.

7    Q    (By Mr. Wong)  Did you receive any citation or

8    traffic ticket for this collision?

9    A    I don't recall.

10   Q    After the vehicles came to rest, what did you do?

11   A    After they came to rest, from my recollection, I

12   asked my passengers if they were okay.

13   Q    Were any of your passengers injured as a result of

14   the collision?

15   A    As I recall, no.

16   Q    What else did you do after that?

17   A    As of right now, all I remember is asking them if

18   they were okay.

19   Q    Did you call the police?

20   A    No.

21   Q    I can see by the photograph on Exhibit 3, photograph

22   B, you talked to the police, is that correct?

23   A    From the photograph, yes.

24   Q    Do you have any recollection about your conversations

25   with the police?

1 A No.

2 Q So you don't remember what you said to them or him or

3 he said to you, correct?

4 A I don't recall.

5 Q Did you talk to the other driver, Mr. Trinh?

6 A I don't recall.

7 Q Did he say anything to you at the accident scene?

8 A I don't recall.

9    MR. LAM:  For the record, can you tell me who

10 took those photographs, because I know in the police

11 report that no photographs were taken.  Do you know who

12 took those?

13    MR. WONG:  No, I don't.

14    MR. LAM:  Have those been produced to opposing

15 counsel before today's deposition?

16    MR. WONG:  I would think so.

17 Q (By Mr. Wong)  Do you recall anything Mr. Trinh did

18 or said at the scene of the collision?

19 A I don't recall.  It was a long time ago.

20 Q Okay.  Your attorney referred to interrogatory

21 answers.  Did you review those interrogatory answers in

22 preparation for your deposition today?

23 A Yes.

24 Q Now, your signature appears at the end of those

25 interrogatories, correct?

1  A    Yes.

2  Q    Did you sign that in Hawaii or in Guam?

3  A    In Hawaii.

4  Q    In other words, it was mailed to you, you signed it

5  and mailed it back?

6  A    Yes.

7  Q    Did you have any discussions with anyone about your

8  answers before you signed it?

9         MR. LAM:   I believe counsel is not including

10  conversations you would have had with your, counsel,

11  right?  To the extent that it invades the attorney/client

12  privilege, I will have to object. You can rephrase the

13  question.

14  Q    (By Mr. Wong)  Did you first get the interrogatories

15  and write in your answers and then send them back to your

16  attorney?

17         MR. LAM:  Objection, that invades the

18  attorney/client privilege, as well.

19         MR. WONG:  I'm just asking how it came about.  I

20  didn't ask what she said to her attorney.

21         MR. LAM:  That, in my opinion, invades the

22  attorney/client privilege with respect to work product

23  and/or discussions had expressly or impliedly with the

24  client.  Therefore, I'm not going to allow her to answer

25  that question.

1    MR. WONG:  I don't want any discussion.  I just

2   want to know how she got the interrogatories.

3        MR. LAM:  The question that you asked is

4   compound.  You can ask her how she received the

5   interrogatories.

6   Q    (By Mr. Wong)  How did you receive the

7   interrogatories?

8        MR. LAM:  As in via mail or electronically, is

9   that what you are referring to?

10       MR. WONG:  Sure.

11       THE WITNESS:  I believe it was mailed.

12  Q    (By Mr. Wong)  Did you get the interrogatories and

13  then write your answers to them on the interrogatories?

14       MR. LAM:  Same objection with respect to

15  answering and how the ultimate answers were provided to

16  counsel, which is all that is relevant, counsel.

17       MR. WONG:  No, it's not.

18       MR. LAM:  We don't have to argue.  I assert the

19  attorney/client privilege with respect to that question as

20  to the methodology of having the answers to

21  interrogatories prepared and submitted.  They are

22  submitted and she signed them pursuant to whatever

23  applicable rules you folks follow down in the Superior

24  Court of Guam and/or the Federal action which would be

25  consistent with the Federal rules.  And if they are

1  signed, they are her answers.  That is all that is

2  required.

3  Q    (By Mr. Wong)  When you got the interrogatories, did

4  you write your answers in there?

5         MR. LAM:  Same objection.  Instruct you not to

6  answer.

7         MR. WONG:  It's a proper question.

8  Q    (By Mr. Wong)  Maryfe, before the date of this

9  collision, had you gotten any traffic citations?

10  A    No.

11  Q    Before the date of this collision, had you been

12  involved in any motor vehicle accidents?

13  A    No.

14  Q    And when I say traffic citations, you understood me

15  to mean those for speeding, for failure to yield, for

16  failure to stop at a stop sign.  Did you understand that?

17  A    Yes.

18  Q    At the time of the collision, were you working for

19  any company?

20  A    Not that I recall, no.

21  Q    So you weren't driving at the time of this collision

22  for any business venture or business company.  It was

23  strictly for your own pleasure and use, is that correct?

24  A    Yes.

25  Q    In the 24 hours before the collision, had you taken

1   any substance that would or could affect your mental

2   ability or ability to drive?

3   A    No.

4   Q    And when I say substance, I'm talking about any

5   alcoholic beverage and/or medication. Do you understand

6   that?

7   A    Yes.

8   Q    At the time of the collision, had you been suffering

9   from any disability or mental illness or disease that

10   would impair your ability to drive?

11   A    No.

12   Q    In terms of your driving a car, in the six months or

13   more before this collision, how often would you drive a

14   car?

15   A    I don't recall. It was a long time ago.

16   Q    Did you drive from home to school?

17   A    I don't recall.

18   Q    Did you take the school bus?

19   A    I don't recall.

20   Q    Did you have other people in the family who drove

21   your mother's car?

22          MR. LAM: This is all during the six months

23   prior to the accident?

24          MR. WONG: Yes.

25          THE WITNESS: Yes, I believe so.

1   Q    (By Mr. Wong)  Who else?

2   A    I don't recall.

3   Q    Did you have brothers and sisters?

4   A    Yes.

5   Q    In terms of your mom's car, was she the primary

6   driver for that car?

7   A    Yes, I believe so.

8   Q    Did she work?

9   A    I don't recall if she was working at that time.

10  Q    When she did work, where did she work?

11        MR. LAM:  Objection, relevance.  You can answer

12  that.

13        THE WITNESS:  She works at Agana Elementary

14  School.

15  Q    (By Mr. Wong)  What did she do there?

16  A    She was a teacher.

17  Q    What grade?

18  A    I don't recall.

19  Q    Was she a full time teacher?

20        MR. LAM:  Hold on, counsel.  Who represents the

21  mother in this matter?

22        MR. WONG:  I think the same people who represent

23  Maryfe.

24        MR. LAM:  Is that right?

25        MR. WONG:  Yes.

1     MR. LAM:  I'm looking at the answers to

2  interrogatories and this says attorneys for Maryfe.  I'm

3  not sure if they represent the mother.

4     MR. WONG:  I think they represent both.

5     THE WITNESS:  What was the question?

6  Q   (By Mr. Wong)  Was she a full time teacher?

7  A   I don't recall at the time.

8  Q   When she taught, did she drive the car to work?

9  A   I don't recall.

10  Q   How did she get to work usually?

11     MR. LAM:  During the six months prior to the

12  accident?

13     MR. WONG:  At any time she worked.  She doesn't

14  recall if it was then.  I'm just trying to find out who

15  used this car.

16     MR. LAM:  I think the question is objectionable

17  to relevance in that form.  Is there a point-- let's say,

18  for example, your question is broad enough to include any

19  time after the day of the accident.  Would that be

20  relevant to this case?

21     MR. WONG:  I don't think so.  But she doesn't

22  recall, so that is all I can go by, counsel.

23  Q   (By Mr. Wong)  When your mother usually went to

24  school to work, did she usually take the car?

25     MR. LAM:  Time frame is important.  What about

1 they don't have this car any more? So if you could limit

2 it to time, I think it might help her answer the question.

3          MR. WONG: It's the 1989 Oldsmobile.

4          MR. LAM: That doesn't mean it's still in

5 existence. I don't know. There has been no foundation.

6 Q    (By Mr. Wong) I'm talking about the year 2000. Did

7 she work at all during the year 2000, do you know?

8 A    I don't recall.

9 Q    She could have but you don't recall one way or the

10 other, correct?

11 A    I don't recall if she worked.

12 Q    All right. She could have but you don't recall,

13 correct?

14 A    Yes.

15 Q    All right. When she did work at the elementary

16 school, did she usually use the car to get there?

17          MR. LAM: When you are referring to the car, you

18 mean the Oldsmobile?

19          MR. WONG: Correct.

20          THE WITNESS: I don't recall.

21 Q    (By Mr. Wong) Who else drove the car?

22 A    I don't recall. It could be anyone in my family.

23 Q    How many people at the time you had your license also

24 had licenses to drive the car? And I'm talking about in

25 the six months that you had your license.

1   A    Everyone in my family.

2   Q    How many are those?

3   A    Four.

4   Q    Your mom, your dad, is that correct?

5   A    Yes.

6   Q    Yourself.  And you have one brother or sister?

7   A    I have one brother and one sister.

8   Q    So that would be five total who could drive that car?

9   A    Yes.

10  Q    And were your brother and sister older than you?

11  A    Yes.

12  Q    How many cars were in the family?

13  A    I don't recall at the time.

14  Q    Did your brother and sister at the time of the

15  collision own their own cars?

16  A    I don't recall.

17  Q    All I'm trying to do, Maryfe, is to understand how

18  many times a week you would drive the car in the six

19  months before the collision.  And I'm sorry for going in

20  such a roundabout way, but since you have such limited

21  recollection, I'm trying to get an idea.

22       Can you give us an estimate that you drove the car

23  once a week, everyday, in the month before the accident?

24  A    I really can't make an estimate.

25  Q    While you were in school before Christmas break, say

1  in the month of November, did you drive the car at all?

2  A    I don't recall.

3  Q    Okay.  If did you, do you have any idea about how

4  much you would drive the car?

5          MR. LAM:  Same objection, speculative, assumes

6  facts not in evidence.  I don't believe this witness-- she

7  has already answered she doesn't recall, Wayson.

8  Q    (By Mr. Wong)  Do you have any idea?

9  A    I don't recall.

10  Q    Did you drive the car everyday during the month of

11  December 2000?

12  A    I don't recall.  It was a long time ago.

13  Q    Do you need corrective lenses now?

14          MR. LAM:  Now meaning 2005?

15          MR. WONG:  Yes.

16          THE WITNESS:  Yes.

17  Q    (By Mr. Wong)  Are you wearing contacts today?

18  A    No.

19  Q    What do you need corrective lenses for?

20  A    I have a stigmatism.

21  Q    And how does that affect your vision?

22          MR. LAM:  If you know.

23          THE WITNESS:  It doesn't really affect my

24  vision.

25  Q    (By Mr. Wong)  Then why would you need corrective

1  lenses?

2        MR. LAM:  Objection, relevance.  There has been

3  no establishment of...

4        MR. WONG:  Let me try and establish the

5  foundation first.

6        MR. LAM:  That's probably one of the problems,

7  Wayson.

8        MR. WONG:  Well, I'm trying to.

9        MR. LAM:  Ask her whether she had a requirement

10  under her license to wear corrective lenses in the year

11  2000.

12        MR. WONG:  I don't want a requirement under the

13  license.  I want to know whether her vision was affected

14  or not.

15  Q    (By Mr. Wong)  How does the stigmatism affect your

16  vision?  Is it difficult for you to see some things?

17        MR. LAM:  Objection as to point in time.

18        MR. WONG:  We can get to that, counsel.

19  Q    (By Mr. Wong)  I just want to know right now.  Is it

20  difficult for you to see some things?

21  A    Right now?

22  Q    Yes.

23  A    No.

24  Q    Can you see well enough to read without any

25  corrective lenses?

1   A    Right now, yes.

2   Q    Have you had some kind of surgery or treatment for

3   your stigmatism?

4   A    No.

5   Q    When you say right now, yes, did you mean to say

6   that, in prior years, you had some vision problems?

7   A    Prior years referring to?

8   Q    Any time before now.

9   A    I don't recall the date I got my glasses.

10  Q    Did you get glasses in Guam or in Hawaii for the

11  first time?

12  A    I believe it was in Hawaii.

13  Q    And why did you get your glasses, for what reason?

14  A    I believe the optometrist recommended them.

15  Q    Why did he recommend it?

16          MR. LAM:  If you know.  Calls for speculation.

17          THE WITNESS:  I don't know.

18  Q    (By Mr. Wong)  Did you complain to the optometrist at

19  all about some problems you were having with your vision?

20          MR. LAM:  Objection, relevance.  You can answer

21  if you know.

22          THE WITNESS:  I don't know.

23  Q    (By Mr. Wong)  Who was the optometrist?

24  A    I don't know.

25  Q    Do you still have those glasses?

1  A    I believe so.

2  Q    Do you use them at all now days?

3  A    Sometimes.

4  Q    What do you use them for?

5  A    To read.

6  Q    Does it help your reading to use those glasses?

7  A    Not to my knowledge, no.

8  Q    Then why do you use them?

9  A    It was recommended by the optometrist.

10  Q    Can you see the clock over the marking board at the

11  end of the room?

12  A    Yes.

13  Q    What does it say in terms of time?

14  A    12:00.

15  Q    Have you ever had any problems with your far distance

16  vision?

17  A    No.

18  Q    Besides the optometrist that you saw in Hawaii, have

19  you seen any other health care provider for any eye

20  problems?

21  A    No.

22  Q    Again, who is this optometrist?

23         MR. LAM:  Asked and answered.

24         THE WITNESS:  I don't know.

25  Q    (By Mr. Wong)  Where is his office or her office

1    located?

2    A    I don't know.

3    Q    When did you last see them?

4    A    I don't know.

5    Q    Okay.  Some time within the last three years?

6    A    I don't recall.

7    Q    Did you have medical insurance to help you pay for

8    that?

9    A    I don't recall if I used insurance.

10   Q    Do you have health care insurance that would cover

11   vision?

12   A    I don't know.

13   Q    Why don't you know that?

14   A    I don't go to the doctor often.  My parents take care

15   of insurance.

16   Q    So if you had any insurance, it would be through your

17   parents' insurance?

18   A    Yes.

19   Q    Sometimes students at the University of Hawaii have

20   the opportunity to obtain their own campus medical

21   insurance, right?

22   A    Yes.

23   Q    But you didn't do that.  You continued to rely on

24   your parents' medical insurance, is that correct?

25   A    Yes.

1    Q    Do you know what insurance your parents have in Guam?

2    A    I don't know.

3    Q    Is your mom still an employee of the Department of

4    Education?

5    A    No.

6    Q    Did she retire?

7    A    Yes.

8    Q    Do you know if the current insurance is called Stay

9    Well?

10   A    I don't know if that is the current insurance.

11   Q    Aside from the collision that occurred on Christmas

12   Eve, have you ever been involved in any other motor

13   vehicle accidents?

14            MR. LAM:  Objection, relevance.  You can answer

15   that question subject to the objection that I posed.

16            THE WITNESS:  Yes.

17   Q    (By Mr. Wong)  When?

18   A    I believe it was a year of 2000-- I'm not sure which

19   year it was.

20   Q    In Hawaii or in Guam?

21   A    In Guam.

22   Q    Were you a passenger?

23   A    No.

24   Q    You were a driver?

25   A    Yes.

1  Q     What type of accident was that?

2  A     I don't-- an auto.

3  Q     Right.  But did you rear end somebody, did somebody

4  rear end you, was it at an intersection where somebody ran

5  a red light?  What kind of accident was it?

6          MR. LAM:  Same objection as to relevance.  You

7  can answer that question subject to my objection.

8          THE WITNESS:  I don't know how to answer that.

9  What do you mean?

10  Q     (By Mr. Wong)  What type of accident was it?  People

11  can say I was in a rear-ender, somebody hit me from the

12  back, I was in an accident at an intersection because

13  somebody ran a stoplight or a red light or somebody came

14  out from nowhere from a side driveway.  What kind of

15  accident was it?

16  A     I don't know how to describe it.

17  Q     Tell us what happened, then.

18  A     I was coming out of a residential roadway.

19  Q     You were coming out of a residential roadway, is that

20  right?

21  A     Yes.

22  Q     And the other car was on the roadway that you were

23  trying to enter?

24  A     Yes.

25  Q     And the other car hit yours or you hit the other car,

1   which one?

2   A    The other car hit me.

3   Q    Where was this at?

4        MR. LAM:  I have an objection to this whole line

5   of questioning with respect to an unrelated accident.  You

6   can answer, if you know.

7        THE WITNESS:  What was your question?

8   Q    (By Mr. Wong)  Where was it at?  What part of town?

9   A    I believe in Asan.

10  Q    Were you coming out of your home area?

11  A    No.

12  Q    And what road was that, Route 1?

13  A    What road?

14  Q    What road was the other car on, Route 1?

15  A    Yes.

16  Q    What road were you coming out of?

17  A    I don't know.

18  Q    Was there a traffic signal at that intersection?

19  A    No.

20  Q    A stop sign for you?

21  A    I don't recall.

22  Q    Were the police called to that accident?

23  A    I don't recall.

24  Q    Were you injured in any way as a result of that

25  accident?

1   in this case rather than pursue them for 150,000 to

2   $300,000 that we felt the case was worth.  That is

3   essentially what the letter indicates.

4          MR. LAM:  I have never seen the letter.  I don't

5   believe the witness has ever seen it.  It's addressed to

6   her counsel.  So I suspect that Mr. Sterling responded to

7   you and your demand.

8          MR. WONG:  He did.  But I want to ask Maryfe a

9   question about the letter that is marked as Plaintiff's

10  Exhibit 5.

11  Q    (By Mr. Wong)  My question to you is, Maryfe, after

12  reviewing it with Mr. Lam, can you tell us whether you

13  have ever seen a copy of this letter that I wrote to

14  Thomas Sterling on August 19, 2003?

15  A    No.

16  Q    Because, in that letter, we had asked Mr. Sterling

17  and the insurance company to give you a copy of it for

18  your information and knowledge.  So as far as you can

19  recall, you didn't see this letter at all and the

20  insurance company has never provided you with a copy of

21  it, is that correct?

22  A    Yes.

23  Q    Thank you.  I have no further questions for you for

24  your deposition, subject to my asking the Court to compel

25  you to answer various questions, because I have right to

1  do that. If I feel that the questions that you were

2  instructed not to answer are proper questions for this

3  case, I have a right to go to the Court and ask the Court

4  to order you to answer the questions and ask the Court to

5  go ahead and reimburse us for our attorneys' fees and

6  costs to do that. Do you understand that?

7  A   Yes.

8  Q   Okay. Again, you have a right in terms of your

9  deposition to review what was said and make any changes or

10 corrections you feel are necessary to make your testimony

11 correct or more accurate. You don't have a right to

12 change the questions, but you have a right to change the

13 answers. But I do want to warn you and caution you that

14 if you do make any changes to your responses, I have a

15 right or anybody else has a right in this case to let the

16 judge know that you have changed your answer and why.

17 Okay?

18 A   Yes.

19         MR. WONG:  Thank you.

20         MR. LAM:  Let's take a short break and we'll

21 come back on the record. I may have a question.

22         (Recess)

23                  EXAMINATION

24 BY MR. LAM:

25 Q   Maryfe, I have one question for you. Mr. Wong asked

1    you a question about whether or not you, according to his

2    definition, yielded to Mr. Trinh. Do you remember that

3    question?

4    A    Yes.

5    Q    And do you remember your response, that you did not

6    yield to him, right?

7    A    Yes.

8    Q    And why did you not yield to him as far as that

9    definition was concerned and used?

10    A    I didn't yield to him because I didn't feel it was

11    necessary.

12    Q    And why didn't you feel it was necessary?

13    A    Because I believed that the car was far enough away

14    for me to make a safe turn.

15        MR. LAM: All right. No further questions.

16    Thank you for that clarification.

17             FURTHER EXAMINATION

18    BY WONG:

19    Q    Maryfe, is it correct to say that you have no idea

20    how far that car was away from you before you made that

21    turn?

22    A    I can't make an estimate on how far. But I know he

23    was far away for me to make the turn.

24    Q    You can't make any estimate at all, is that correct?

25    A    Yes.

1   Q   So you can't tell us whether it 20 feet away or 100

2   feet away from you before you made that turn, is that

3   correct?

4   A   I can't make an estimate.

5   Q   So you can't tell us either way, correct?  You can't

6   tell us whether it was 20 feet or 100 feet or any distance

7   from you before you made that turn, correct?

8   A   I can tell you that it was far enough away.

9   Q   What is far enough?  In terms of feet, what is far

10  enough?

11  A   I can't make an estimate in feet.

12  Q   Do you know what is far enough in terms of this

13  accident or collision?

14  A   I'm sorry?

15  Q   Do you know what was far enough in terms of this

16  accident or collision in terms of feet as far as distance

17  Mr. Trinh was away from your car before you made your left

18  turn?

19  A   I cannot make an estimate in terms of feet referring

20  to how far.

21  Q   Because you don't know, is that correct?

22  A   I don't know the distance in feet.

23  Q   Do you know the distance in any other form of

24  measurement, you being an engineer and familiar with

25  meters, feet, yards?  Can you give us any estimate at all

1  as to how far Mr. Trinh was from your car before you made

2  that turn?

3  A    No.

4         MR. WONG:  I'm going to give you an extra copy

5  of the August 19, 2003 letter that is marked as Exhibit 5

6  so counsel can have it and discuss it with you for this

7  case.

8         MR. LAM:  Counsel, I represent to you that I

9  have not been retained by Guam counsel to discuss the

10  contents of this letter with the witness.  I will

11  represent to you that I will forward this letter down to

12  Mr. Sterling and ask him to do as he deems fit to do with

13  your question.

14         MR. WONG:  The other thing I would ask you to do

15  is, if Maryfe requests a copy of the letter, to please

16  provide it to her.

17         MR. LAM:  I will let Mr. Sterling decide on

18  that.

19      As far as handling the transcript, you should contact

20  my office, because she is here, to review it, and I will

21  work out the details with Mr. Sterling as to making sure

22  she gets change to review it and make any corrections.

23         (At 12:17 p.m., the deposition concluded)

24

25

1     I, MARYFE CULIAT, do hereby certify that I have read

2    the foregoing typewritten pages 1 through 82, inclusive,

3    and corrections, if any, were noted by me; and that same

4    is now a true and correct transcript of my testimony.

5

6    Dated _____

7

8

9        _____

10

11

12

13   Signed before me this_____

14   day of_____, 2004.

15

16   _____

17

18

19

20

21

22

23

24

25

STATE OF HAWAII )
)

1    I, DONNA KOHLS, C.S.R., a Notary Public in and for

the State of Hawaii, do hereby certify:

That on March 22, 2005, at 10:05 a.m., appeared

before me MARYFE CULIAT, the witness whose testimony is

contained herein, that prior to being examined, the

witness was by me duly sworn; that the proceedings were

taken in computerized machine shorthand by me and were

reduced to print; that the foregoing represents to the

best of my ability, a correct transcript of the

proceedings had in the foregoing matter;

That the witness, if applicable, was notified through

counsel, by mail or by telephone to appear and sign; that

if the transcript is not signed, either the reading and

signing were waived by the witness and all parties, or the

witness failed to appear and the original is therefore

kept on file without signature pursuant to Court Rules.

I further certify that I am not counsel for any of

the parties hereto, nor in any way interested in the

outcome of the cause named in the caption.

Dated:_____MAR 2 9 2005_____


_____
Donna Kohls, C.S.R., No. 146
Notary Public, State of Hawaii
My commission expires: 7-21-05



March 29, 2005

**Case, Bigelow & Lombardi**
**MICHAEL LAM, ESQ.**
**Pacific Guardian Center, Mauka Tower**
**□737 Bishop Street, Suite 2600**
**Honolulu, Hawaii, 96813**


RE:             **CASE NO. 03-00017**
                **TRINH ET AL v CULIAT ET AL**

Deposition(s) of:   **MARYFE CULIAT**

Enclosed is the original signature page of your client's deposition. A xerox copy of this page has been inserted in the original transcript in lieu thereof. This is done as an accommodation to make it more convenient to secure signature. However, it is your responsibility to return the signature page and corrections, if any, to us before the 30-day expiration.

Please have your client read your copy and note down any corrections on the correction sheet enclosed using a black ink pen. After this has been done, please have your client sign and date the original signature page and correction sheet (if used), before a witness.

If not signed by APRIL 28, 2005, the original will be sealed without signature, and barring any stipulation by counsel, will be forwarded to noticing counsel for retention pursuant to Rule 30(f)(1).

Your client is entitled to 30 days in which to read and sign his/her deposition; however, if trial intervenes, and request is made for this deposition to be filed with the court prior to trial, we will do so without further notice to you.

TRIAL DATE SET FOR:

Sincerely yours,

Donna Sato and Diane Ohata
Oral Transcripts Department

cc:  original transcript
     WAYSON W. S. WONG ESQ.



1    2    3    4

To Micronesian Mall

Ex6.1

Deposition Exhibit No.
Deposition of Cullat

# GUAM POLICE DEPARTMENT
## TRAFFIC ACCIDENT REPORT

PAGE # 01

**ACCIDENT CLASSIFICATION:**
☐ FATAL ☑ NON-FATAL ☐ NON-INJURY ☐ NON-TRAFFIC ☐ OTHER

**CASE NO.** 00-22256

**ACCIDENT INVOLVED: (CHECK APPROPRIATE BOX)**
☑ Automobile(s) ☐ Overturn ☐ Pedal Cycle ☐ Bus ☐ Fixed Object
☐ Parked Vehicle ☐ Motorcycle ☐ Truck (Heavy Equipment) ☐ Pedestrian ☐ Non-Collision
☐ Ran Off Roadway ☐ Moped ☐ Trailer ☐ Animal ☐ Other

**RECEIVED** JAN 0 ? 2000 / 26 2000
GUAM POLICE DEPARTMENT RECORDS ID SECTION

### LOCATION / TIME

Location: ROUTE 16
By: MICRONESIA MALL, DEDEDO          Best Area: A8
Date: 12-24-00   Time: 12:30 AM/**PM**   Day of Week: SUNDAY
Notified of Accident: Date: 12-24-00   Time: 12:35 AM/**PM**
Investigation Made: Date: 12-24-00   Time: 12:37 AM/**PM**
Investigation Elsewhere: NONE   Date: _____
Is the Investigation Completed? ☑ Yes ☐ No
Where Photographs Taken? ☐ Yes ☑ No   By Whom: NONE

☐ Residential
☐ Industrial
☐ Business
☐ School or Playground
☐ Open Country
☐ Other

| VEH# | YEAR | MAKE | MODEL | PLATE# | VIN# | STATE | COLOR |
|------|------|------|-------|--------|------|-------|-------|
| 1 | 1996 | NISSAN | SENTRA | AGT3970 | 3N1AB41DXTL010357 | GU | GREEN |

### VEHICLES INVOLVED

Driver: LUAN Q. TRINH   D.O.B. 7-17-68   AGE 32   SEX M
Home Address: HARMON INDUSTRIAL PARK AREA   Home Phone 649-4187   Race: VIET.
Occupation: NONE   Place of Employment: N/A
DL# T74324907B07681   Type: OPERATOR   State: NJ
Restrictions: NONE   SS# 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   Work Phone: NONE
Insurance: NANBO INS.   Policy No. A4082585
Owner: PAI VAN NGUYEN   D.O.B. ___   Age ___   Sex ___
Address: _____   Phone No. _____
Vehicle Traveling ☐ East ☐ West ☑ North ☐ South On ROUTE 16
Impoundment ☐ Yes ☑ No   Vehicle Moved To ROADSIDE STORAGE
Posted Speed: NONE MPH   Driver's Estimated Speed UNKNOWN MPH

**CIRCLE POINT OF IMPACT (SHADE DAMAGED AREAS)**
AMOUNT: $ 2000 .00
T TOP
U UNDERCARRIAGE
N NONE

| YEAR | TRAILER (Other Unit) MAKE | MODEL | PLATE# | VIN# | COLOR |
|------|---------------------------|-------|--------|------|-------|
| | | N/A | | | |

| VEH# | YEAR | MAKE | MODEL | PLATE# | VIN# | STATE | COLOR |
|------|------|------|-------|--------|------|-------|-------|
| 2 | 1989 | OLDSMOBILE | CIERA | ORKDLVR | 2G3AN151WXK2400500 | GU | BLUE |

### VEHICLES INVOLVED

Driver: MARYFE A. CULIAT   D.O.B. 8-5-84   AGE 16   SEX F
Home Address: AGAT   Home Phone 565-5626   Race: FIL
Occupation: STUDENT (11TH)   Place of Employment: SOUTHERN HIGH SCHOOL
DL# 1586-86-0286   Type: OPERATOR   State: GU
Restrictions: NONE   SS# 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   Work Phone: NONE
Insurance: MOYLAN'S INS.   Policy No. KMHA000269A00
Owner: FELY A. CULIAT   D.O.B. ___   Age ___   Sex ___
Address: _____   Phone No. _____
Vehicle Traveling ☑ East ☐ West ☐ North ☐ South On ROUTE 16
Impoundment ☐ Yes ☑ No   Vehicle Moved To ROADSIDE STORAGE
Posted Speed: NONE MPH   Driver's Estimated Speed UNKNOWN MPH

**CIRCLE POINT OF IMPACT (SHADE DAMAGED AREAS)**
AMOUNT: $ 1500 .00
T TOP
U UNDERCARRIAGE
N NONE

| YEAR | TRAILER (Other Unit) MAKE | MODEL | PLATE# | VIN# | COLOR |
|------|---------------------------|-------|--------|------|-------|
| | | | | | |

CASE NO.

**ACCIDENT CLASSIFICATION:** AUTO-AUTO, 1 NON-FATAL, CIVILIANS, MEDIC 10 TRANSPORT    00-22256

**VIOLATOR(S):** Veh. # _2_    ☐ Pedestrian    ☐ Other

Name _MARYFE A. CULIAT_      Charge(s) _FAILURE TO YIELD_
     _T-16 GCA_

**DISPOSITION:**   ☐ Arrested     ☐ Citation Issued
    ☑ Verbally Warned     Ticket No. _____

**INJURY CODE:**
(1) Complaint of pain, no visible injuries.
(2) Bruises, abrasions, swelling, limping, etc.
(3) Bleeding wound, distroted member.
(4) Dead at time of report.

**SEAT CODE:**

```
7  4  1
8  5  2   ▷        11 10
9  6  3
```

**VEHICLE #**   ☑ Injury Code   ☑ Driver   ☐ Passenger   ☐ Pedestrian

(1) _LUAN Q. TRINH_
    First      M.I.      Last

☑1 Seat Code    Use (a) As Additional Passenger Example (5a)

_VIET._   _M_   _32 yrs_   _7-17-68_   _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_
Race    Sex    Age    D.O.B.    Soc. Sec. #

Home Phone _649-4187_   Bus. Phone _NONE_   Transported to _GMH_   Transported by _MEDIC 10_

**CLE #**   ☐ Injury Code   ☐ Driver   ☐ Passenger   ☐ Pedestrian    ☐ Seating Code

(2) _NONE_
    First      M.I.      Last      Race   Sex   Age   D.O.B.   Soc. Sec. #

Home Phone _____ Bus. Phone _____ Transported to _____ Transported by _____

**WITNESS(ES)**

(1) Name _MARIA TAIMANGLO_     Home Address _AGAT_

Home Phone _565-5323_   Bus. Phone _NONE_   D.O.B. _UNK._   Soc. Sec.#/I.D.# _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_

(2) Name _ELVIN CORTEZ_     Home Address _BARRIGADA_

Home Phone _472-2785_   Bus. Phone _NONE_   D.O.B. _UNK._   Soc. Sec.#/I.D.# _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_

**ADDITIONAL INFORMATION:** [Injured Person(s), Passenger(s), Witness(es), ...Etc.]

| VEH# | NAME | HOME ADDRESS | HOME PHONE | BUS. PHONE | INJURY CODE | SEAT CODE |
|------|------|--------------|------------|------------|-------------|-----------|
| | ISEBIU REYES | INARAJAN | 828-3946 | SSN # 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 | N/1 | 6 |
| | CARMIN CRUZ | SANTA RITA | 565-5264 | 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 | A/1 | 6 |
| | | | | | ☐ | ☐ |
| | | | | | ☐ | ☐ |
| | | | | | ☐ | ☐ |
| | | | | | ☐ | ☐ |

1.
2.
3.

Assigned Officer: _PO' V B CRUZ_    (signature)    I.D. No. _624_
    PO3 J. T. JASMIN #489     (signature)     I.D. No. _489_
Supervisor Approving:    PRINT

**ASSIGNED PRECINCT**
☑ NPC   ☐ CPC   ☐ SPC   ☐ OTHER _____

**CASE STATUS**
☐ OPEN   ☐ SUSPENDED   ☑ CLOSED

Forwarded To:   ☐ TRAFFIC INVESTIGATIONS    ☐ SPECIAL INVESTIGATIONS    ☐ ATTORNEY GENERAL

**2+**

## CHEMICAL TESTS

| 1/3 | 2/4 | Pedestrian | | | |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ Blood Narcotics Results ___ | Where Tested ___ | Time ___ | By Whom ___ |
| ☐ | ☐ | ☐ Blood Alcohol Results ___ | Where Tested ___ | Time ___ | By Whom ___ |
| ☐ | ☐ | ☐ Urine Alcohol Results ___ | Where Tested ___ | Time ___ | By Whom ___ |
| ☐ | ☐ | ☐ Breath Alcohol Results ___ | Where Tested ___ | Time ___ | By Whom ___ |
| ☐ | ☐ | ☐ Field Sobriety Results ___ | Where Tested ___ | Time ___ | By Whom ___ |
| ☐ | ☐ | ☐ Other ___ | Where Tested ___ | Time ___ | By Whom ___ |

*N/A*

## VEHICLE MANEUVER

1/3  2/4
- ☑ ☐ Going Straight
- ☐ ☐ Turn Right to Private Drive
- ☐ ☐ Turning Left to Street
- ☐ ☑ Turning Left to Private Drive
- ☐ ☐ Slowing or Stopped for Signal or Sign
- ☐ ☐ Slowing or Stopped for Entering Traffic
- ☐ ☐ Slowing or Stopped Other
- ☐ ☐ Starting in Traffic
- ☐ ☐ Starting from Parked Position
- ☐ ☐ Stopped in Traffic Lane
- ☐ ☐ Parked Unattended
- ☐ ☐ Backing from Drive Way
- ☐ ☐ Backing from On-Street Parking Space
- ☐ ☐ Entering from Private Roadway
- ☐ ☐ Changing Lanes
- ☐ ☐ Passing
- ☐ ☐ Other ___

## WERE SEATBELTS IN USE?

1/3  2/4
- ☑ ☑ Yes
- ☐ ☐ No
- ☐ ☐ Unknown

## MOTORCYCLE HELMET IN USE?

1/3  2/4
- ☐ ☐ Yes
- ☐ ☐ No
- ☐ ☐ Unknown

*N/A*

## TYPE OF ACCIDENT

- ☑ Right Angle
- ☐ Sidewipe (Same Direction, Opposite Direction)
- ☐ Head On
- ☐ Rear End
- ☐ Turning from Wrong Lane
- ☐ Left Turn (Opposing Traffic)
- ☐ Left Turn (Crossing Traffic)
- ☐ Right Turn (Crossing Traffic)
- ☐ Object on Roadway
- ☐ Pedestrian
- ☐ Other ___

## CONDITION OF DRIVER(S) OR PEDESTRIAN(S)

1/3  2/4  Pedestrian
- ☑ ☑ Apparently Normal
- ☐ ☐ Physically Handicapped
- ☐ ☐ Wearing Glasses
- ☐ ☐ Illness
- ☑ ☑ Had Not Been Drinking
- ☐ ☐ Had Been Drinking, and
- ☐ ☐ Ability Impaired
- ☑ ☑ Ability Not Impaired
- ☐ ☐ Unknown Whether Impaired
- ☐ ☐ Other ___

## WEATHER CONDITIONS

- ☐ Clear
- ☑ Cloudy
- ☐ Rainy
- ☐ Storm
- ☐ Typhoon
- ☐ Other ___

## ROAD DEFECTS

- ☐ Defective Shoulders
- ☐ Holes, Deep Ruts
- ☐ Loose Material on Surface
- ☑ No Defects
- ☐ Other ___

## LIGHT CONDITIONS

- ☐ ___wn
- ☐ ___ylight
- ☐ Dusk
- ☐ Dark (Street Lights Off)
- ☐ Dark (Street Lights On)
- ☐ Dark (No Street Lights)

## ROAD SURFACE

- ☑ Asphalt
- ☐ Concrete
- ☐ Dirt/Sand
- ☐ Gravel

## ROAD CONDITIONS

- ☑ Dry
- ☐ Wet
- ☐ Muddy
- ☐ Unknown
- ☐ Other ___

## CONTRIBUTING FACTORS

1/3  2/4
- ☐ ☑ Failure to Yield
- ☐ ☐ Following too Closely
- ☐ ☐ Improper Passing
- ☐ ☐ Improper Turn
- ☐ ☐ Drinking
- ☐ ☐ Speeding
- ☐ ☐ Weather (Inclement)
- ☐ ☐ Disregard Stop Sign
- ☐ ☐ Disregard Signal
- ☐ ☐ Wrong Side of Road
- ☐ ☐ Inattention
- ☐ ☐ Avoiding Vehicle, Pedestrian, Object
- ☐ ☐ Vision Obstructed By ___
- ☐ ☐ Unknown
- ☐ ☐ Other ___

## TRAFFIC CONTROLS

1/3  2/4
- ☑ ☑ No Control
- ☐ ☐ Stop Sign
- ☐ ☐ Traffic Signal
- ☐ ☐ Flashing Signal
- ☐ ☐ Yield Sign
- ☐ ☐ Police Officer
- ☐ ☐ Flagman
- ☐ ☐ No Passing Zone
- ☐ ☐ Other ___

## ROAD CHARACTER (Check Two)

1/3  2/4
- ☐ ☐ Curve
- ☑ ☑ Straight
- ☐ ☐ Upgrade
- ☐ ☐ Downgrade
- ☐ ☐ Hill Crest
- ☐ ☐ Dip
- ☑ ☑ Level
- ☐ ☐ Other ___

## ROAD TYPE

1/3  2/4
- ☐ ☐ One Lane
- ☐ ☐ Two Lanes
- ☑ ☑ Three Lanes
- ☐ ☐ Four Lanes
- ☐ ☐ One Way
- ☐ ☐ Merging Lanes
- ☐ ☐ W/Median Lanes
- ☐ ☐ Lanes Under Construction
- ☐ ☐ Other ___

## VEHICLE CONDITION (Check one or more)

1/3  2/4
- ☐ ☐ Defective Brakes
- ☐ ☐ Improper Lights
- ☐ ☐ Defective Steering Mechanism
- ☐ ☐ Defective Tires
- ☐ ☐ No Defects
- ☐ ☐ Tinted Windows
- ☑ ☑ Other __UNKNOWN__

## PEDESTRIAN

Was Going ___ ☐ On ___ ☐ Across From ___ To ___

Direction (N.S.E.W.)    Street, Hwy No.    (S.E. Corner to N.E. Corner, or West Side to East Side)

*N/A*

- ☐ Crossing at Intersection with Signal
- ☐ Same - Against Signal
- ☐ Same - No Signal
- ☐ Same - Diagonally
- ☐ Crossing not at Intersection

☐ Walking on Roadway (Check Two)
1 With Traffic    3 Sidewalks Available
2 Against Traffic    4 Sidewalks Not Available
☐ ___ing in ___
☐ Getting on or off Other Vehicle

- ☐ Working on Roadway
- ☐ Playing on Roadway
- ☐ Hitching on Vehicle
- ☐ ___way (___)
- ☐ Yes  ☐ No  Were Crosswalks Marked?

CASE NO. 00-22256



SHADE ARROW TO INDICATE NORTH
TO SCALE: ☐ Yes ☑ No

ENTRANCE TO
MICRONESIA MALL

CONCRETE
MEDIAN

EXIT FROM
MICRONESIA MALL

STOP
SIGN

NOTE: POSITION OF
VEHICLES UPON MY
ARRIVAL POINT OF
IMPACT AND DAMAGES
AS NOTED.

### SCENE MEASUREMENTS

| DESCRIPTION | N | S | E | W |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

☐ COORDINATION METHOD
☐ TRIANGULATION METHOD
☐ OTHER _____

Synopsis: V-1 TRAVELING NORTHBOUND ROUTE 16 BY MICRONESIA MALL ON THE OUTER MOST LANE WHEN V-2 EXECUTED A LEFT TURN FROM THE MEDIAN LANE TO THE MICRONESIA MALL WEST ENTRANCE THUS STRIKING V-1.

Assigned Officer: PO' VB CRUZ     I.D. No 629

PO3 J. T. JASMIN #489

Supervisor Approving:     I.D. No _____

ASSIGNED PRECINCT
☐ NPC ☐ CPC ☐ OTHER _____

CASE STATUS
☐ OPEN ☐ SUSPENDED ☑ CLOSED

Forwarded To:
☐ TRAFFIC INVESTIGATIONS
☐ CRIMINAL INVESTIGATIONS
☐ SPECIAL INVESTIGATIONS
☐ JUVENILE INVESTIGATIONS
☐ ATTORNEY GENERAL
☐ OTHER _____



A



B

Exb 3



Oldsmobile

Nissan

# LAW OFFICES OF WAYSON WONG

A Professional Corporation

August 19, 2003

**HAND DELIVERY**

Thomas C. Sterling, Esq.
Klemm, Blair, Sterling & Johnson
Suite 1008, Pacific News Building
238 Archbishop F. C. Flores St.
Hagatna, Guam 96910

5:13p.m.

AUG 1 ~ 20~~

KLEMM BLAIR STERLING & JOHNSON

Re:  Trinh et al. v. Culiat, et al.

Dear Tom:

I have indicated to you that I would be providing you with a policy limit settlement demand.  This is it.

As you will see, the insurer's failure to accede to this demand would be like playing Russian roulette with the financial well being of the Culiat family.

On behalf of my clients, Luan Q. Trinh and Chi Luong, I offer to settle all of their claims against Marife Culiat, Fely Culiat, Gabriel Culiat and their insurer, Dongbu Insurance Co., Ltd., arising out the collision involving Mr. Trinh and Marife Culiat on December 24, 2000, for the payment of the applicable Dongbu Automobile Policy policy limit.  You have indicated to me that that limit is $25,000 per person.  Both my clients and I are relying on that indication.

Thank you for providing me with a copy of the Declarations page for that policy (policy no. KMHA000277-A01 for the policy period 11/30/2000 – 11/30/2001).  It confirms the $25,000 per person policy limit previously described.

I.    FACTS OF CASE REVISITED

A.    Prior Settlement Offer and Current Settlement Value

On December 1, 2001, my co-counsel, attorney Jacques Tran, wrote to Moylan's Insurance Underwriters, Inc., that handles Dongbu insurance claims.  In that letter, he

---

set forth the liability of Marife Culiat, Mr. Trinh's substantial injuries and damages and our request for settlement in the amount of $150,000. He enclosed copies of the documents that supported his points about such liability and damages. You have advised me that Moylan's has no record of such letter. I enclose a copy of his letter and its enclosures under Tab 1 of the enclosed black folder.

As of that December 1, 2001 date, Mr. Trinh's case probably was worth $150,000, but I think it is now worth somewhere between $150,000 – over $300,000, because of the persistence of his residual pain and problems for the many years since the collision and neurologist Russell Abrams' recent May 2, 2003 medical report confirming Mr. Trinh's C5 – C6 herniated disc (causing thecal sac and cord compression and the narrowing of the left neural foramen) and the intermittent residual neck, arms, low back and left leg pain Mr. Trinh is still experiencing. A copy of that report is enclosed for your review under Tab 2 in the black folder.

    B.    Your Insured's Liability

On liability, Marife Culiat violated Mr. Trinh's right of way. As she was facing south on Route 16 (median lane), she turned left in front of Mr. Trinh, who was travelling north. She struck the driver's side front of his car with the passenger side half of the front of her car. There is no doubt that Marife was negligent in causing this collision. She has liability to Mr. Trinh and Mrs. Luong for their collision related injuries and damages.

    C.    Injuries Information Revisited

The GMH records submitted with attorney Tran's letter were not clear, and he did not have the GMH bill. I enclose a copy of those records and that bill under Tab 3 in the black folder; they are clearer and more complete.

As indicated in attorney Tran's previous letter and the supporting documents, after returning from Guam to New Jersey, Mr. Trinh began treatment with chiropractor Larry Sabel. He was diagnosed with numerous neck and back problems, including radiculopathy.

Dr. Sabel referred Mr. Trinh to Open MRI of Cherry Hill, New Jersey for MRI scans of his neck and back. Those MRIs revealed three bulging cervical discs and two bulging lumbar discs. The cervical MRI also revealed the herniated C5 – C6 disc.

In Dr. Sabel's October 16, 2001 Final Narrative Report (enclosed as part of Tab 1), he noted that:

> ... the patient will have a history of flare-ups of pain and/or spasm at times
> of increased use or stress. It is likely that the patient will continue to have
> episodes of pain and/or spasm for an indefinite period of time in the future.
> It is probable that the patient will have a need for continuing care
> subsequent to these episodes.

(See, bottom of page 5 or that report.) Also, without taking away from the significance
of the herniated C5 – C6 disc, Dr. Sabel explained why Mr. Trinh probably has and will
experience pain because of his numerous bulging discs. Those bulges are evidence of
force applied to those areas to cause such bulging. Such force can tear the annular
fibers of the disc "...thus causing pain through these sinuvertebral nerves [nerves, the
receptors of which are in those annular fibers]." (See third paragraph of page 6 of that
report.)

D. Damages Information Revisited

1. Special Damages

a. Past Medical-Rehabilitative Expenses Updated

The invoices and bills for Mr. Trinh's medical-rehabilitative expenses total
$12,086.45. The include those enclosed with attorney Tran's letter and the GMH
Emergency Room treatment bill (copy enclosed under Tab 3) and Dr. Abrams recent
May 2003 charge for $76.00. A copy of the latter bill is also enclosed under Tab 2.

b. Past Wage Loss

We estimate Mr. Trinh's past wage loss has been at least $6,000. We have
calculated it as follows. He worked with a dry cleaner for about six months in 2000,
before visiting Guam. He earned about $1,000 per month there. He has estimated that
he would have completely missed any type of work for at least six to seven months from
the date of the collision. His tax returns for 2000 and 2001 confirm his approximately
$1,000 per month income for 2000, and show his lack of income for 2001; copies of
them are enclosed under Tab 4. He has since taken odd jobs, but nothing has come
along to provide him with steady income and good employment benefits like sick leave,
medical coverage and vacation pay.

c. Future Special Damages

Given the fact that Mr. Trinh's damages are already so far above the applicable
policy limit, we have not taken the time and incurred the expenses to better estimate his
future special damages. But if Dongbu fails to pay the policy limit to settle this case, we
will undertake the evaluations necessary to prove such probably very substantial

additional future damages. We would then have the chance to recover Mr. Trinh's full damages from Dongbu, which will justify the expenditure of the time and costs to do that.

Dr. Sabel described the need for continuing care after Mr. Trinh's episodes of flare-up. In view of the over $12,000 in medical-rehabilitative expenses already incurred, they could be very substantial. We could establish them by asking Dr. Sabel to re-evaluate Mr. Trinh to give us a more detailed prognosis as to his future medical-rehabilitative expenses.

Given Mr. Trinh's many injuries and resulting problems from them, his loss of earning capacity and/or future wage loss probably is substantial. If needed, we could have a vocational rehabilitation specialist give us a good assessment of such future losses.

d.    Total Past and Future Special Damages

Both past and future special damages can easily exceed the $25,000 policy limit described, without even considering the general damages for pain, suffering, emotional distress and the loss of enjoyment of life Mr. Trinh is likely to unfortunately experience.

2.    General Damages

To evaluate total damages, both special damages and general damages, adjusters and attorneys many times use a factor between 3 – 5, to multiply the amount of the special damages to roughly estimate what a case is worth in terms of settlement. Insurers usually try to use 3; and the injured parties try to use 5. But in this case, if one were to use that analysis, by merely using 2 as a factor, the total damages for this case would significantly exceed the $25,000 policy limit.

Clearly, this case has a potential judgment value of much more than $25,000.

That factor methodology probably does not coherently apply to cases where there will be future damages, it usually is used in cases where the injured party has fully recovered. But as indicated, this case is very different. There does not appear to be any good recovery on the horizon for Mr. Trinh. He probably will have to live with episodes of pain and related problems for the rest of his life.

As an alternate and probably more appropriate approach to evaluating general damages, one could give Mr. Trinh about $12,000 for his initial trauma and the first year of pain and suffering he experienced together with about $6,000 per year for each of the next years in the future he probably will be suffering. As indicated by attorney Tran, he probably had a life expectancy of another 43 years, after the first year following the

collision. That would entitle him to $270,000 in past and future general damages. If you add his past and future special damages to that, the total probably would be over $300,000.

Also, Mrs. Luong would be entitled to loss of consortium damages.

Granted, I am not clairvoyant, and the fact finder may indeed find damages at less than $300,000. However, any reasonable fact finder should find damages far in excess of the $25,000 policy limit.

I described the refusal to settle for the policy limit at this time as playing Russian roulette. In a case like this, usually the injuries get worse than better. Mr. Trinh could very well be an exacerbation away from surgical intervention for his C5 – C6 disc. I have seen judgments that easily reach $150,000 for just that type of injury. To me, to force the insured to wait and face that type of increased risk is like playing Russian roulette with the insured's financial condition. It is inviting virtually certain financial disaster to befall the insured.

## II.    POTENTIAL BAD FAITH

As you know, it would be bad faith on the part of your insurer to gamble with the personal assets of its insured when liability is clear and damages are far in excess of the policy limit, as both are in this case. By failing to settle this case for the policy limit at this time, Dongbu would truly be gambling with Marife Culiat's assets and be in bad faith. It would be subjecting her to a very substantial excess judgment that she would have to pay out of her own pocket. There is no doubt in my mind that she would insist that Dongbu protect her from paying such excess judgment by simply paying the policy limit to settle this case.

Marife Culiat and her parents should be advised of this offer right away so she can retain her own attorney to advise her of the danger of not settling this case now, and so she can request and demand that your insurer settle it now. To facilitate that, I have enclosed an additional copy of this letter for her.

As you are aware, the failure of Dongbu to heed such a demand would subject it to pay the otherwise excess judgment. That would be because of its bad faith in failing to protect its insured.

This policy limit settlement offer will remain open until September 19, 2003; thereafter, it will be withdrawn. I will then recommend to my clients that we proceed to full judgment in the U. S. District Court case. This settlement offer is an offer to compromise within the scope of 6 G.C.A. § 408, and I invoke the protections against its

Thomas C. Sterling, Esq.
August 19, 2003
Page 6

disclosure contained in that statute. If you have any comments or questions concerning
the above matters, please contact me.

Very truly yours,

Law Offices of Wayson Wong
A Professional Corporation

Wayson W. S. Wong

Enclosures
WWSW:pjw
cc: Mr. and Mrs. Luan Trinh
    Jacques Tran, Esq.

# *Tran & Tran, P.C.*

### *Attorneys-at-Law*
107 Fairway Terrace
Mount Laurel, New Jersey 08054-4015
Telephone: (856) 722-1100
Telecopy: (856) 787-0267
Email: tntpclaw@aol.com

Phong N. Tran *
Charlotte L. Tran ⁔

Amber L. Altschul, Paralegal

**Philadelphia, PA Office**
Telephone: (215) 592-9100
**Wilmington, DE Office**

Meetings also available in
Avocation NJ Colonese City West
From old NJ East Kat Turnpike)

PLEASE RESPOND TO
THE NEW JERSEY OFFICE
FILE NO.:PTA 431

⁔ Admitted in NJ, PA, DE & DC Bars: CPA
⁔ Admitted in NJ, PA & DC Bars, M B A



December 1, 2001

## FOR SETTLEMENT DISCUSSION ONLY WITHOUT PREJUDICE

## BY UPS INTERNATIONAL DELIVERY

Moylan's Insurance Underwriters, Inc.
705 South Marine Drive
Tamuning, Guam 96913-3545
ATTENTION: CLAIMS DEPARTMENT

      Re:     <u>Settlement Demand - Bodily Injury Claims</u>
             Our Clients:     Luan Q. Trinh
             Your Insured:    Fely A. Culiat (Driver: Maryfe A. Culiat)
             Accident Date:  12/24/00
             Your Policy No:  KMHA000269A00

Dear Sir/Madam:

    Please be advised that this office represents the interests of Luan Q. Trinh for personal injuries and related damages as the result of a motor vehicle accident which occurred on the above noted date. Based on the information provided on the Guam Police Department Traffic Accident Report, it appears that the responsible driver was a Moylan's insured.

    Please note our representation of Mr. Trinh and kindly advise the identity of the claims representative, the claim number and the correct address for corresponding with your company. Please also verify that the tortfeasor had a valid automobile liability insurance policy with your company on the date of the collision and kindly verify the applicable liability insurance limits.

    To assist your adjuster in review of this matter and the setting of appropriate reserves, we are providing the this letter as our request for settlement of the above-referenced matter. I am sure

that you share our view that both sides have a strong obligation to do their utmost to settle cases at the earliest possible opportunity, in order to save the time, expense, and anxiety that come with delay.

## ACCIDENT DESCRIPTION & LIABILITY

This matter involves a claim for personal injuries as the result of a two (2) vehicle accident which occurred on December 24, 2000 at approximately 12:35 p.m. on Route 16, in Dededo, Guam. Our client, Luan Q. Trinh. a resident of New Jersey, United States of America, was visiting Guam and was driving a 1996 Nissan Sentra with the permission of the vehicle owner in a northerly direction in the right hand lane of Route 16 near the Micronesia Mall. At that same time and place, your insured, Maryfe A. Culiat, was the operator of a 1989 Oldsmobile Ciera owned by your insured. Fely A. Culiat which was also proceeding in a northerly direction on Route 16 in the median lane. Ms. Culiat attempted to turn into the west entrance of the Micronesia Mall from the median lane and turned directly into the path of the Trinh vehicle, striking the left front corner of it. Photographs of the property damage sustained by both vehicles taken at the scene of the accident are annexed for review.

## DAMAGES

### *Injuries*

Claimant, Luan Q. Trinh is thirty-three (33) years of age and has a life expectancy of 43.30 years. As a direct result of the negligence of your insured. Mr. Trinh sustained the following serious, permanent injuries:

1. Disc Herniation at C 5-6 with Encroachment on the spinal cord.
2. Bulging Discs at C3-4, C4-5 and C6-7.
3. Bulging Discs at L4-5 and L5-S1.

From the accident scene. Mr. Trinh was taken by ambulance to Guam Memorial Hospital where he complained of pain on the left side of his head and reported to the triage nurse that he had hit the left side of his head on the driver's side door. He indicated to the medical staff that he had suffered brief loss of consciousness, felt very sleepy and that it had taken thirty minutes to extricate him from the vehicle. A CT of his head was performed and he was diagnosed as suffering from a closed head injury. Medication for pain and spasm was prescribed and it was recommended that Mr. Trinh seek additional medical care upon his return to the United States.

On January 22, 2001. Mr. Trinh consulted Larry Sabel, D.C., a chiropractic physician and reported to Dr. Sabel that he was experiencing pain in his neck and lower back as well as

headaches. Dr. Sabel performed a thorough examination of Mr. Trinh and noted multiple objective signs of injury including restricted range of cervical and lumbar motion, spasm, and positive orthopedic and neurologic testing. A conservative course of chiropractic treatment was instituted including the use of specific spinal adjustments, traction, massage and trigger point therapy.

Due to the severity of his symptomatology, additional diagnostic testing and a neurologic consultation was recommended.

An MRI of the Cervical Spine was performed on February 6, 2001 and revealed evidence of Disc Bulging at C3-4, C4-5 and C-7 with indentation on the thecal sac, a disc herniation at C5-6 with encroachment upon and distortion of the spinal cord and narrowing of the left neural foramen.

An MRI of the Lumbar Spine was performed on February 6, 2001 and revealed evidence of bulging discs at L4-5 and L5-S1 with flattening and indentation on the thecal sac.

Based on the results of his examination and the diagnostic testing that was performed, Dr. Sabel amended his earlier diagnosis of Mr. Trinh to reflect his opinion that he was suffering from:

1. Acute post-traumatic cervical, thoracic, and lumbosacral sprain and strain;
2. Cervicocranial syndrome;
3. Subluxation, cervical and lumbar spine
4. Annulus Bulges at C3-4, 4-5, 6-7, L4-5, L5-S1
5. Herniated disc at C5-6

At Dr. Sabel's recommendation, claimant presented to Russell Abrams, M.D. for a neurological consultation on March 15, 2001. Dr. Abrams performed a thorough neurological examination of Mr. Trinh and opined that he was suffering from headaches, cervical radiculopathy and lumbosacral radiculopathy.

Dr. Abrams re-examined Mr. Trinh on March 29, 2001.

As noted in Dr. Sabel's final report, Mr. Trinh's injuries have caused and are continuing to cause serious and permanent consequential limitations of use and function of his lower back, left leg, headaches, and hands. He diagnosed Mr. Trinh with "Acute post-traumatic cervical, thoracic, and lumbosacral sprain/strain; cervicocranial syndrome; subluxation, cervical and lumbar spine; Annulus bulges at C3-4, 4-5, 6-7, and L4-5 and L5-S1; disc protrusion (herniation) at C5-6; cervical radiculopathy and lumbosacral radiculopathy; headaches."

### *Medical Bills*

| Medical Provider | Total Expenses |
|---|---|
| Dr. Larry Sabel, Sabel Chiropractic | Total Billed $9,179.00 / $2,469.90 o/s |
| Neuro Pain Associates, Dr. Abrams | $310.00 |
| MRI of Cherry Hill | Total Billed $1832.00 / $1,099.20 o/s |
| Guam Memorial Hospital | To be supplied |
| *TOTAL EXPENSES* (Excluding Hospital) | Total Billed: $11,321.00 Plus Hospital Bill $3,848.20 Plus Hospital Bill O/S |

## LOST WAGES

No claim for lost wages is being asserted, although Mr. Trinh was out on disability for several months and applied for State of New Jersey Temporary Disability benefits.

## PAIN AND SUFFERING

Our client's medical records show that Mr. Trinh has been experiencing significant pain and a suffering since the date of the collision and he will likely continue to experience residual symptoms as the direct result of the negligence of your insured. Considering the lack of any contributory negligence on the part of our client, we include unnecessary pain and suffering as a substantial portion of this demand.

## DEMAND

On the basis of clear liability, lack of comparative negligence, medical bills as specified herein and pain and suffering, we hereby request a settlement in the amount of $150,000.00. A reasonable New Jersey jury, in our opinion, would have little difficulty in awarding that amount, an possibly more.

This demand is made without prejudice and will be held open for a period of four (4) weeks in the expectation that you will review your file and respond within that period. Since you have communicated with us that you wish to review the details concerning this matter in order to set a reserve, we feel the firm specified is reasonable. It is hoped that this matter can be resolved

without the necessity of expensive and protracted litigation. I look forward to speaking with you at your earliest convenience.

Very truly yours,

TRAN & TRAN, P.C.

Phong N. (Jacques) Tran, Esquire
For the Firm

cc: Luan Trinh

K:\SETTLEMENT LIBRARY\SETTLEMENT DEMANDS\P\A0433\ Luan Trinh settlement demand pn.wpd